EARL VEST AND FAY VEST, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3726–69.    Filed October 28, 1971.

*William L. Kerr*, for the petitioners.
*Frederick B. Strothman*, for the respondent.

STERRETT, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes for the indicated years:

| Year | Deficiency |
|---|---|
| 1965 | $762,913.92 |
| 1966 | 13,561.30 |
| 1967 | 3,863.48 |

This case presents the Court with four questions for determination:

(1) Whether petitioner received certain shares of Standard Oil Co. of California as part of a tax-free corporate reorganization or as a lease bonus or advanced royalty on an oil and gas lease, in 1965.

(2) Whether $33,422 received by petitioners during 1966, from Standard of California with respect to roads, flowlines, well locations, and tank batteries located on petitioners' ranch is taxable as ordinary income or as capital gain received for the sale of a surface easement.

(3) Whether the amount of $20,000 paid in 1965 under a fee agreement with a trustee of a revocable trust established by petitioners constitutes an ordinary and necessary business expense.

(4) Whether an agreement between petitioners and Shell Oil Co. was a disposition of water rights and a perpetual easement such that payments made pursuant to the agreement in 1965, 1966, and 1967 constitute capital gain, or whether the agreement was instead a lease of water rights generating ordinary income.

### FINDINGS OF FACT

Earl Vest (hereinafter referred to as Earl) and Fay Vest are husband and wife (hereinafter collectively referred to as petitioners). At the time of filing their petition herein they resided in Monahans, Tex. They filed their joint Federal income tax returns for the taxable years 1965, 1966, and 1967 with the district director of internal revenue, Dallas, Tex. Petitioners have one son named Sam Vest (hereinafter referred to as Sam). Sam and the petitioners will hereinafter be referred to collectively as the Vests.

Earl's attorney during the years in issue was William Monroe Kerr. William Monroe Kerr, along with his father, William L. Kerr, and his brother, Ted M. Kerr, was a partner in the law firm of Kerr, Fitz-Gerald and Kerr.

In 1936 Earl purchased 12,009 acres of land in Winkler and Ector Counties, Tex., known as the Cowden Ranch. The land continues to be known as the Cowden Ranch. At that time Earl acquired full rights to the surface of and certain less extensive interests in the minerals in and under the 12,009 acres.

The Cowdens, during their owership, had conveyed to others a portion of the mineral interests in the land. Earl believed that by the 1936 conveyance he acquired, in addition to all of the surface, all of the executive, bonus, and rental rights in oil, gas, and other minerals (except an undivided one-sixteenth interest under 80 acres), and also undivided royalty interests, as follows:

| Fractional interests of royalty | Number of acres | Fractional interests of royalty | Number of acres |
|---|---|---|---|
| All | 1,280 | 15/16 | 160 |
| 11/64 | 880 | 27/64 | 8,969 |
| 23/64 | 80 | | |
| 43/64 | 640 | | 12,009 |

Over the years, Earl conducted cattle-ranching operations on the surface of the Cowden Ranch, and in the early years of his ownership gave oil and gas leases on portions of the ranch as opportunities presented themselves. Throughout his adult life Earl has engaged in the cattle business. During the 1950's Earl, Sam, and two others did some oil and gas exploration together, drilling in excess of 60 wells.

During all times relevant to this case, Chevron Oil Co., a California corporation authorized to do business in Texas, was a wholly owned subsidiary of Standard Oil of California, a Delaware corporation. Chevron sometimes operated in Texas under the name of Standard Oil of Texas. Chevron Oil Co., Standard Oil of California, and Standard Oil of Texas hereinafter will be collectively referred to as Standard. Standard, over a period of several years, had been trying to acquire from Earl oil and gas leases on parts of the Cowden Ranch.

On May 9, 1964, petitioners made a gift to their son Sam, individually, of an undivided one-third interest and to Sam, as trustee for his children, of an undivided two-thirds interest in all the mineral interests owned by petitioners in the north half of each of six sections on the west side of the Cowden Ranch, and in an additional quarter section of each of said sections. Earl retained a quarter section in each section with the idea of drilling it himself thereby to prove the acreage conveyed to Sam.

Sometime prior to July 1964, a representative of Standard negotiated with Earl for a lease in western 6,640 acres of the Cowden Ranch. Initially Earl was not interested in making a deal because he felt the consideration offered by Standard was too small.

On July 6, 1964, the Standard representative suggested to Earl that Standard might be willing to pay $1 million for mineral rights on the 6,640 acres. Earl indicated that he was interested in making a deal for that amount, provided the manner in which the transaction was consummated would not produce taxable income. It was Earl's opinion that he could exchange the mineral interest in the western 6,640 acres of the Cowden Ranch for the surface rights to another ranch without incurring taxes on the exchange. Earl suggested that Standard purchase a ranch worth $1 million to Earl's liking and then trade it for the mineral interests Standard desired. Additionally, it was requested that Standard pay to the Vests the usual one-eighth royalty subject to proportionate reduction as the Vest's interests might appear, plus an additional or bonus royalty not subject to reduction. As a result of the proposed deal, Standard was to receive a net 75-percent working interest in the oil and gas under the west end of the Cowden Ranch. Standard's representative

was receptive to the proposal and, on July 9, 1964, reported it back to his company recommending approval. The recommendation proceeded through channels in Standard and was approved by the executive committee of that organization on July 16, 1964. Sometime thereafter Earl and Standard agreed that the proposed trade would be carried out on the basis outlined.

In anticipation of the trade with Standard, Earl and Sam Vest, on July 14, 1964, rearranged the manner in which the Vest family held its mineral interests in the Cowden Ranch. Consequently, in the 6,640 acres that Standard wanted, Sam, individually and as trustee for his children, became owner of a fractional undivided interest in oil, gas, and other minerals equal to the fractional undivided interest therein that the Vest family owned in oil and gas royalties, and Earl became owner of the remaining fractional undivided interest in the oil, gas, and other minerals subject to nonparticipating royalties which were outstanding when Earl acquired the Cowden Ranch. The rearrangement was undertaken so that Earl could convey to Standard in fee simple all his interest in oil and gas in the 6,640 acres in exchange for a ranch and Sam could give a lease to Standard and collect royalties.

During late 1963 and early 1964, Earl had been in contact with a consulting geologist concerning the costs and possible success of drilling oil and gas wells on the Cowden Ranch. In a letter of April 30, 1964, Earl terminated his retention of the geologist, stating "As of now it will be some time in the future before I proceed with any definite plans, * * *."

In the fall of 1964 Standard obtained title abstracts covering the Cowden Ranch. The abstracts were forwarded to the law firm of Baker, Botts, Shepherd & Coates (hereinafter referred to as Baker, Botts) for the preparation of a title opinion with respect to the 6,640 acres Standard proposed to lease. Baker, Botts rendered its title opinion on December 11, 1964. The law firm concluded there were serious difficulties with respect to two conveyances made in 1930 to Limpia Royalties, a trust estate (hereinafter referred to as Limpia), by Earl's predecessors in title, the Cowdens. The instruments making the two conveyances, according to Baker, Botts, might properly have been construed as having transferred to Limpia a full one-half mineral interest in the Cowden Ranch and not merely a one-half nonparticipating royalty interest. If the instruments represented mineral conveyances rather than nonparticipating royalties, it would have meant that the Vest family owned something less than one-half of the mineral interests in the Cowden Ranch.

Earl's desire that Sam receive not only a proportionally reduced one-eighth royalty but also a one-eighth bonus royalty not subject to reduction ran athwart another difficulty raised by Baker, Botts that had to be resolved if the transaction between the Vests and Standard was to be consummated. In addition to the questionable conveyances to Limpia, there had been a number of other conveyances with respect to the Cowden Ranch over the years. These conveyances created nonparticipating royalties. However, the greater portion of these conveyances granted not a fractional royalty but a fraction of a royalty, so that the amount of the royalty actually due on production could not be determined until such time as the holder of the executive rights leased the minerals, retaining a specific royalty. It was feared that the nonparticipating royalty holders might resort to litigation to establish their right to a larger royalty.

Standard, and Earl and his lawyer, William Monroe Kerr, were of the opinion that the Baker, Botts assessment of the 1930 conveyances to Limpia was not correct, and attempted to convince them of that fact. Nonetheless Baker, Botts persisted in its view that the 1930 conveyances might be construed as royalties and that there should be obtained from Kewanee Oil Co. (hereinafter referred to as Kewanee), as the successor in interest to Limpia, a satisfactory corrective instrument which would indicate that Kewanee possessed only a nonparticipating royalty interest. Earl and Standard felt that such an approach was not desirable because it might induce Kewanee to assert a right to the larger interest. During January and February 1965, William Monroe Kerr and Standard's attorney continued to discuss the problems raised as a result of the Baker, Botts opinion.

The officials at Standard handling the Vest transaction were interested in finding some grounds for ignoring the Baker, Botts opinion and proceeding with the deal as planned. Standard knew that other oil companies had been developing properties subject to conveyances similar to that made to Limpia and considering them as royalty conveyances. On February 25, 1965, Standard decided as a business risk to treat the 1930 conveyances to Limpia as royalty conveyances. Standard did not immediately inform the Vests or their lawyers of this decision.

With regard to the question of how much the nonparticipating royalty owners would get, William Monroe Kerr assured Standard that the additional payment Sam was to get, properly construed, would be considered a bonus and not a royalty. Standard was concerned as to whether William Monroe Kerr's opinion was correct. The solution to this problem proposed by Standard was that they be guaranteed a full 75-percent working interest and that the Vests assume the risk

the additional payment to Sam might be construed as a portion of the true royalty. As of February 23, 1965, William Monroe Kerr had accepted this approach to the royalty problem. While this satisfied Standard it did not solve the problem of getting Sam an additional one-eighth unreduced royalty. As of the first part of March 1965, William Monroe Kerr was faced with the problem of how to proceed so as to limit Kewanee and other royalty holders to a proportion of the Standard one-eighth royalty, and also allow Sam to get a greater share of the production from the Cowden Ranch.

As the Vests and Standard were developing their proposed transaction, it was discovered that Humble Oil Co. had drilled offsetting oil wells to the west of that portion of the Cowden Ranch that Standard wanted to acquire. An offsetting well is one drilled on land adjacent to one's property and located close enough to cause drainage of the oil under the property. Standard, the Vests, and the royalty holders were concerned about the possibility of drainage. Kewanee sent Earl a letter urging development of the west end of the Cowden Ranch, and Standard was pressing Earl to close the deal. Earl responded to Kewanee's urgings in a letter dated June 2, 1965, stating "we are in the planning of a drilling program and expect to have it operating in the near future."

In late March, 1965, Earl was diagnosed as having cataracts on both eyes which would require surgery. His eyes became worse very quickly in the summer of 1965. Earl was informed by his doctors that there would be a 6-month recovery period after surgery during which he was not to strain himself, lift anything, or lean over. Commencing in early 1966, Earl underwent a series of three operations for his cataract condition.

From the time Earl and Standard agreed to the ranch trade, a continuing effort on the part of both Earl and Standard was made to find a ranch to Earl's liking. The search proved fruitless. Although some aspects of the set of problems raised by the Baker, Botts opinion had been settled, the Vests and Standard had reached an impasse in their effort to mutually resolve the problems in a manner which would simultaneously accommodate Standard's desire for a 75-percent working interest, and Earl's insistence on a tax-free transaction and a bonus for Sam, and the claims of the nonparticipating royalty holders. When this impasse was reached neither of the parties could think of a means to effectuate a ranch trade. William Monroe Kerr continued to discuss the matter with Standard's house counsel and Baker, Botts throughout March and April. By June 1965, there was clearly no longer any prospect of trading the Cowden Ranch minerals for a new ranch.

In May 1965, William Monroe Kerr began to devise a new approach to the development of the Cowden Ranch mineral interests. The plan would entail Earl drilling the property himself. The first step in the plan was to place Earl's interests in the Cowden Ranch minerals in a revocable trust. Next the trust would transfer all its interest in oil and gas in the west 6,640 acres of the Cowden Ranch to a corporation. The corporation was also to acquire from Sam all of the Cowden Ranch mineral interests held by him. Sam would retain the one-eighth royalty proportionally reduced, and also would have the right to obtain a one-fourth working interest in each well drilled upon payment of his share of the development expenses. William Monroe Kerr felt this phase of the transaction would obviate the possibility that the additional amount due Sam might be considered part of the true royalty in which the nonparticipating royalty holders would share. The corporation was to acquire funds for development from Earl, who had as much as a half a million dollars available for such use.

On June 14, 1965, and prior to taking action to implement the new scheme, William Monroe Kerr explained the plan in detail to representatives of Standard. William Monroe Kerr suggested to Standard that it might be able to acquire the portion of the Cowden Ranch minerals that it wanted by exchanging Standard stock for the stock of the corporation to be formed, and acquiring Sam's proposed working interest in exchange for a one-eighth overriding royalty. The possibility of an exchange was taken under consideration by Standard and passed up through corporate channels. Standard's executive committee authorized an exchange on July 6, 1965, but this action was not communicated to the Vests until late July.

While the proposal was pending with Standard, the attorneys for the Vests provided Standard with copies of the mineral transfer documents to be executed in favor of the proposed trust and the corporation. The documents were given to Standard for its examination and approval.

Petitioners, on July 19, 1965, executed an instrument creating Vest Trust No. 1 (hereinafter referred to as the trust). The instrument appointed Ted M. Kerr as trustee. Also on July 19, 1965, petitioners executed oil, gas, and mineral leases in favor of Ted M. Kerr as trustee covering the entire Cowden Ranch.

Prior to July 19, 1965, Ted M. Kerr and Earl had never discussed the formation of Vest Trust No. 1, and had never had a business transaction together. Before the formation of Vest Trust No. 1, Ted M. Kerr had never negotiated any oil, gas, or mineral leases for Earl Vest. On July 19, 1965, Earl signed a letter addressed to Ted M. Kerr, trustee, indicating the availability of $100,000 for use in drilling and

exploration. The letter was prepared in the law offices of Kerr, Fitz-Gerald and Kerr.

The articles of incorporation for the V Bar Oil Co. (hereinafter referred to as V Bar) were executed on July 19, 1965, and filed in the office of the secretary of state of the State of Texas on July 21, 1965. The initial board of directors and the incorporators of V Bar were Ted M. Kerr, William Monroe Kerr, and William L. Kerr. Ted M. Kerr was made president of V Bar.

Pursuant to a corporate resolution dated July 21, 1965, V Bar on July 22, 1965, issued 1,000 shares of its stock to the trust in exchange for a lease covering oil, gas, and other hydrocarbons in the west 6,640 acres of the Cowden Ranch which were of interest to Standard. On July 22, 1965, Sam, individually and as trustee for his children, executed a lease to V Bar covering all Sam's interest in oil, gas, and other hydrocarbons in the west 6,640 acres of the Cowden Ranch. Sam retained a one-eighth royalty and, by a side agreement with V Bar, received in lieu of a bonus, a right to acquire 25 percent of the lessee's working interest in the well upon reimbursing the operator for 25 percent of the costs paid and incurred in drilling the well.

Ted M. Kerr, the president of V Bar, did not know if the corporation had any bank accounts. V Bar did not have an office or any office equipment. The corporation also had no employees. V Bar did not incur any expense for geological work, engineering, surveying, or seismic exploration. Additionally, the corporation never earned any income.

On or about July 23, 1965, William Monroe Kerr advised a representative of Standard that, although Standard in the past had had contact with Earl, Earl no longer owned the leases and there was nothing in writing addressed to V Bar indicating Standard's interest in the west 6,640 acres of the Cowden Ranch. Immediately thereafter Standard sent a letter dated July 23, 1965, to V Bar expressing an interest in working out a deal. Ted M. Kerr, writing as president of V Bar, replied by letter dated July 29, 1965, in which it was stated that a stock exchange was under discussion and that V Bar was anxious to conclude negotiations by reason of the drilling outside the corporation's property.

On or about July 23, 1965, William Monroe Kerr furnished Standard with copies of the Vest leases, articles of incorporation for V Bar, and the letter agreement between Sam and V Bar. The documents were submitted for Standard's consideration and approval.

When the possibility of a stock exchange was first discussed between a representative of Standard and William Monroe Kerr, the latter had not yet informed Earl of the prospect. William Monroe

Kerr told the Standard representative that the proposal was strictly William Monroe Kerr's idea, and that it was subject to Earl's approval. Earl was not made aware of the possibility of a stock exchange with Standard until late in July 1965, and at no time prior thereto had he personally discussed a stock exchange with any representative of Standard. William Monroe Kerr informed Earl about the prospect of a stock exchange at some time after July 19. Earl made no immediate decision but rather took it under consideration for a month. Thereafter, Earl told William Monroe Kerr that the proposed exchange was acceptable if it could be worked out.

Sometime prior to August 9, 1965, Standard requested an opinion from Baker, Botts regarding the plan of reorganization prepared by William Monroe Kerr. In a letter dated August 9, 1965, Baker, Botts recommended, *inter alia*, that the last paragraph of section "Eighth" of the trust executed by petitioners on July 19, 1965, pertaining to distributions be amended. On August 16, 1965, Earl executed an instrument amending the trust by substituting for the then-existing last paragraph of section "Eighth" the language of a new paragraph as suggested by Baker, Botts. The Baker, Botts opinion also recommended certain other changes in the plan of reorganization which were effected.

A definite plan for the stock exchange was not presented to Earl until August 1965. On the day the plan of reorganization was signed by Ted M. Kerr as trustee, Earl and his attorneys conferred for 2 hours prior to the signing. During the conference they discussed and debated whether Earl would authorize the deal.

On August 25, 1965, a "Plan of Reorganization" was signed by Standard and by Ted M. Kerr, as trustees for Vest Trust No. 1. The plan provided that all the outstanding 1,000 shares of V Bar would be exchanged for 14,000 shares of common stock of Standard Oil Co. of California, on September 25, 1965, or such date as the parties chose. The agreed exchange of stock took place on September 23, 1965, at which time the fair market value of Standard's stock was $71.50 per share. Until that time Vest Trust No. 1 had been the only stockholder of V Bar. Standard commenced drilling on the western 6,640 acres of the Cowden Ranch immediately after the plan of reorganization was signed.

On October 18, 1965, the members of the original board of directors of V Bar were replaced by representatives of Standard. A "Plan of Liquidation" was adopted by V Bar on October 26, 1965. Pursuant to the plan of liquidation, V Bar assigned the Cowden Ranch leases to Standard which assumed the side agreement allowing Sam Vest to acquire one-fourth of the working interest upon payment of expenses. V Bar was dissolved November 9, 1965.

The second question results from the inclusion by the petitioners on their 1966 income tax return of an item of capital gain from the sale of a "right-of-way" acquired in 1940. The petitioners reported this gain as follows:

| | |
|---|---:|
| Amount received | $49,798.60 |
| Less 50 percent | (24,899.30) |
| | 24,899.30 |

However, $33,422 of the $49,798.60 represented a payment received from Chevron or Standard computed as follows:

| | |
|---|---:|
| 1. Well locations at $150 each | $1,650 |
| 2. Tank batteries at $50 each | 100 |
| 3. Flowlines and roads at $5 per rod | 31,672 |
| | 33,422 |

Under its terms, the oil and gas lease from petitioners dated July 19, 1965, to Ted M. Kerr as trustee of Vest Trust No. 1 was to be for a period of 5 years and so long thereafter as gas, oil, or other minerals are produced from the land. Additionally paragraph 10 of the lease provided:

10. It is understood and agreed that if and when exploratory, development or producing operations are conducted on the above described land, Lessee, its successors and assigns, for the surface easement herein granted, shall pay to the surface owner at Kermit, Texas, on demand $150.00 per well location, $50.00 per tank battery site, $50.00 for each single shot hole, $150.00 for each multiple shot hole pattern in connection with seismograph or kindred operations on the land covered hereby, and $5.00 per linear rod for roads constructed and for pipelines laid * * *. Payment of said sums shall be in full payment for the surface rights in connection with the herein enumerated operations, but, Lessee, all successors and assigns, shall be and remain liable to the surface owner and to Lessor for any actual damage caused by Lessee, and all successors and assigns, to the surface of said land and water therein and thereon, grass, vegetation and growing crops thereon, and livestock operations thereon of the surface owner or occupier, occasioned by neglect or unreasonable use of said surface of the above described land, on demand, at Kermit, Texas, in the respective amounts above set out.

On August 19, 1965, the district superintendent of Standard wrote a letter to Earl referring to a payment of $33,422, due under the provisions of paragraph 10 of the July 19, 1965, lease, and including the same schedule of computations set out above. The letter was captioned "Surface Damages/Vest Ranch Lease/Winkler and Ector Counties, Texas." A space on the letter was provided for Earl's signature. Earl, however, did not sign the August 19 letter.

A new letter dated September 13, 1966, which was in most respects similar to the August 19 letter, was sent to Earl, and on September 14, 1966, Earl placed his signature of acceptance on the letter in the spot provided. The September 13 letter differed from the August 19

138

letter in that it was captioned "Surface Easements/Vest Ranch Lease/ Winkler and Ector Counties, Texas." Also in those parts of the August 19 letter where reference was made to "surface damages," the September 13 letter made reference to "surface easements." In the September 13 letter Standard states "This letter supersedes our letter of August 19, 1966."

The relevant facts with respect to the third issue commence with a letter dated September 23, 1965, which Ted M. Kerr, trustee, wrote to Earl and which stated in part:

We have discussed the matter of my compensation for the services rendered and to be rendered as Trustee of the Vest Trust No. 1, created by Trust Indenture dated July 19, 1965, and have agreed on a fee of $20,000.00 if paid now in a lump sum.

It will be quite some time, of course, before the income generated by the Trust from its oil, gas and mineral leasehold estate and Standard of California stock will be sufficient to pay the Trustee's fee and the attorney's fees and expenses. Under these circumstances, it would be appropriate, I think, that you should at this time contribute to the Trust corpus the sum of at least $22,729.36.

Attached to the letter was a statement dated September 23, 1965, from the law firm of Kerr, Fitz-Gerald and Kerr to Ted M. Kerr, trustee, for services and expenses in the amount of $2,729.36 performed for petitioners and V Bar. The amount of the trustee fee was arrived at after a consultation between Earl, William Monroe Kerr, and Ted M. Kerr.

On or about September 27, 1965, Earl paid $22,729.36 to the Ted M. Kerr Trust Account at the First National Bank of Midland, Tex. Also on September 27, 1965, Ted M. Kerr wrote two checks on the Ted M. Kerr Trust Account. One check was payable to the order of Ted M. Kerr, trustee, in the amount of $20,000, and the other was payable to Kerr, Fitz-Gerald and Kerr in the amount of $2,729.36. In conformance to the firm's policy Ted M. Kerr paid the trustee fee over to Kerr, Fitz-Gerald and Kerr. Prior to 1965 Earl had been paying Kerr, Fitz-Gerald and Kerr a retainer of $2,500 per year.

In his capacity as trustee, Ted M. Kerr acquired an oil and gas lease from the petitioners. He participated in the organization of the V Bar Oil Co. and the stock exchange between V Bar and Standard. However, all the instruments regarding the organization of Vest Trust No. 1, V Bar, and the oil and gas leases executed in favor of those entities, and the plan of reorganization for V Bar and Standard were prepared by William Monroe Kerr. The negotiations concerning the stock exchange between Standard and V Bar were conducted by William Monroe Kerr who functioned in a similar manner while Earl and Standard were considering the exchange of a ranch for

the Cowden Ranch mineral interests. All participation of Ted M. Kerr in the events leading to the exchange of stock between V Bar and Standard resulted from conferences with William Monroe Kerr and other members of the firm of Kerr, Fitz-Gerald and Kerr. Ted M. Kerr signed and filed 1965 and 1966 tax returns for the trust. The returns, however, were prepared by William Monroe Kerr.

The trust continued to hold the Standard stock until February 1967 when William Monroe Kerr arranged to have it transferred to the petitioners. During the interim, Ted M. Kerr collected and distributed dividends on the stock. As trustee, Ted M. Kerr continues to hold those mineral rights in the Cowden Ranch transferred to him by petitioners and not transferred to V Bar. At some unspecified times after October 1965, Ted M. Kerr received various inquiries about proposed transactions concerning the remaining Cowden Ranch mineral interests, which inquiries were sent on to Earl. Nothing ever resulted from these inquiries, and the trust incurred no expenses with respect to them. The trustee fee was also paid in anticipation of possible litigation by Kewanee over royalty questions. The possibility of such litigation was eliminated after a representative of Kewanee called on Ted M. Kerr who immediately referred the representative to William Monroe Kerr. Under the fee agreement, Earl was not to be charged for any additional services performed by the trustee, and in fact, has not been charged for matters transpiring since the fee was paid. The appointment of Ted M. Kerr as trustee was at the suggestion of William Monroe Kerr.

The final question arises by reason of the petitioners' reporting in each of their income tax returns for the taxable years 1965, 1966, and 1967, the following amounts as having been received on the sale or exchange of "water rights":

| Year | Amount |
|------|--------|
| 1965 | $4, 545. 80 |
| 1966 | 11, 278. 64 |
| 1967 | 10, 806. 51 |

Petitioners claimed no basis in the "water rights" and treated the entire amounts received as capital gain.

The amounts received were paid to petitioners by Shell Oil Co. (hereinafter referred to as Shell). The payments were made pursuant to an agreement between petitioners and Shell contained in two documents referred to as Sales Agreement and Conveyance both dated April 29, 1963 (hereinafter referred to as the water agreement).

Under the water agreement, Shell received "all the water rights between the depths of 3,000 and 6,500 feet beneath the surface" of certain described lands belonging to petitioners in Winkler County, Tex., known as the Hallie Ranch. Petitioners, however, reserved the

right to "water necessary or required in connection with the exploration for and production of other mineral" covered by the agreement. Shell also acquired a right-of-way over the subject lands to operate a trunk pipeline for the transportation and distribution of water, along with the right of ingress and egress to such line and for the purposes of developing the water rights. The agreement stated that Shell's purpose in acquiring the water rights was "primarily to obtain sufficient reserves" of water for use in secondary recovery of oil by means of water flood.

The total amount to be paid petitioners under the water agreement was referred to as the "purchase price" and was defined as the remittance of the monthly payment provided for in the water agreement each month through December 2038. The monthly payments were to be determined according to the amount Shell received for "purchase price water." Purchase price water was defined as water produced from the water rights petitioner had transferred to Shell or from other water rights acquired by Shell from others in Winkler, Ward and Ector Counties, Tex., during April 1963, or from other specified areas of Winkler County that might be brought under the agreement at a latter time, or any water, not otherwise covered by the agreement, transported through pipelines constructed pursuant to the agreement. Each monthly installment was to equal 13⅓ percent of 3 percent of what Shell received for purchase price water during the month until 1.4 billion barrels of water were covered by the agreement then the amount due would rise to 13⅓ percent of 6 percent of purchase price water. Shell was not required to pay a certain fixed amount, regardless of whether water production and transportation were discontinued, and did not assure petitioners that payments under the water agreement would equal any fixed dollar amount.

The water agreement gave Shell the option, if "purchase price water" were to fall below an average of 50,000 barrels per day for 6 months, to be relieved of any further liability to pay the "purchase price" by transferring the acquired water rights back to petitioners. If the water rights are transferred back to petitioners under these circumstances, Shell thereafter had the option of acquiring the right to transport substances other than water through any pipeline laid under the agreement by paying petitioners $10 per rod of pipeline.

From April 29, 1963, the date the agreement was entered into, through the years involved in this proceeding, Shell has not drilled water wells, removed water from petitioners' land, or laid pipelines on petitioners' land. None of the payments made to petitioners pursuant to the agreement during the years 1965, 1966, or 1967 were capitalized by Shell. Shell charged all the payments to "water supply system expense" which is an expense account.

Respondent's position with respect to these issues is stated in his statutory notice dated May 23, 1969. Therein he determined that the entire value of the 14,000 shares of Standard stock transferred to Ted M. Kerr on September 23, 1965, is includable in petitioners' 1965 income, and that such income constitutes ordinary income.[1] It was also determined in the notice that the $33,422 petitioners received in 1966 with respect to roads, flowlines, well locations, and tank batteries was ordinary income and not capital gain as reported by the petitioners. The statutory notice disallowed deduction of the $20,000 trustee fee for the reason that "this amount was paid to the firm of Kerr, Fitz-Gerald and Kerr for services rendered in setting up the trust which was established for * * * [petitioners'] benefit." Finally, in the notice respondent determined that the amounts received by petitioners in 1965, 1966, and 1967 pursuant to the water agreement with Shell is ordinary income rather than capital gain.

### OPINION

The first issue which must be decided is whether petitioners, under sections 354(a)(1)[2] and 368(a)(1)(B)[3] of the Internal Revenue Code of 1954,[4] received certain shares of Standard Oil of California stock as part of a tax-free corporate reorganization,[5] or whether the shares were received as a lease bonus or royalty on an oil and gas lease.

---

[1] In the statutory notice, respondent valued the Standard stock at $77.875 per share as of the date of transfer, and computed petitioners' gain accordingly. The parties have now agreed that the stock had a value of $71.50 on the date of transfer. Respondent has also agreed that if it is determined by this Court that the Standard stock was received by petitioners as a lease bonus or advance royalty, petitioners will be entitled to a depletion allowance.

[2] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
    (a) GENERAL RULE.—
        (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[3] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
    (a) REORGANIZATION.—
        (1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—
            (A) a statutory merger or consolidation;
            (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

[4] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

[5] In certain circumstances an exchange of stock followed by liquidation of the acquired corporation, as occurred here, might properly be regarded as a C-type reorganization. See sec. 1.382(b)–1(a)(6), Income Tax Regs.; *Commissioner* v. *Dana*, 103 F. 2d 359 (C.A. 3, 1939), affirming 36 B.T.A. 97 (1937); *WAGE, Inc.*, 19 T.C. 249 (1952); Goldman, "The C Reorganization," 19 Tax L. Rev. 31, 37 (1964). However, a determination of whether the transfer of the Standard stock conforms to the definition of a C reorganization is not necessary for a disposition of the issue before us.

To recite briefly the relevant facts on this issue, Standard had for a long while been interested in drilling for and producing oil and gas from parts of Earl's property known as the Cowden Ranch. In fact Earl and Standard agreed in late 1964 that all of Earl's mineral interests in the western 6,640 acres of the Cowden Ranch would be transferred to Standard if a ranch acceptable to Earl and worth $1 million could be found which could be exchanged for the mineral interests. In anticipation of this ranch/minerals exchange, the Vest family rearranged the manner in which they held the minerals in the western 6,640 acres of the Cowden Ranch. As a result of the rearrangement Earl held, in fee, a fractional undivided mineral interest, without the right to royalties, which could be exchanged for a ranch; and Earl's son Sam held, in fee, a fractional undivided mineral interest which could be leased to Standard for a bonus and royalties.

After Earl and Standard had agreed to the form of the proposed ranch/minerals exchange, Standard's attorneys rendered an opinion that there was a cloud on the Vests' title to the Cowden Ranch minerals and that certain nonparticipating royalty owners might be entitled to a larger royalty than Standard had anticipated. The cloud on title developed from the fact that among the number of mineral conveyances made by Earl's predecessors in title were two which could be construed as transfers not merely of nonparticipating royalties, but rather of full mineral interests. If such were the case, the amount of minerals the Vests had available for Standard would have been less than one-half what the parties initially thought. The amount of royalty Standard would have to pay became a question because the greater portion of the numerous royalty conveyances made by Earl's predecessors in title granted not fractional royalties but rather fractions of royalties. As a result there was concern that the additional one-eighth bonus to be paid Sam could be considered part of the true total royalty, and that the nonparticipating royalty holders might litigate to achieve such a result.

In February, 1965, Earl's attorney, William Monroe Kerr, agreed with Standard that Standard would be guaranteed a 75-percent working interest and that the Vests would assume the risk the bonus to Sam might be considered part of the total royalty. While this quieted Standard's fear of having to pay out more in royalties than anticipated, the Vests were left with the problem of protecting Sam's proposed one-eighth bonus from being subject to claims for proportionate reduction in favor of the nonparticipating royalty holders. In the meantime, Standard, as a business risk, had decided to assume that there was no further cloud on the Vests' title to the Cowden Ranch mineral interests. Neither Earl nor his attorney were informed of this decision.

While the ranch/minerals exchange was being developed, Humble Oil Co. drilled offsetting wells to the west of the Cowden Ranch land in which Standard was interested. This created concern that the oil under the Cowden Ranch would be drained, and the most significant of the nonparticipating royalty holders urged Earl to undertake development of the mineral interest.

Petitioners, on July 19, 1965, created a revocable trust known as Vest Trust No. 1, and appointed Ted M. Kerr, the brother and law partner of William Monroe Kerr, as trustee. On the same date the petitioners leased all the Cowden Ranch oil, gas, and minerals to the trust. The V Bar Oil Co. was created on July 19, 1965, and on July 22, issued 1,000 shares of its stock to the trust in exchange for a lease covering oil, gas, and other hydrocarbons in the western 6,640 acres of the Cowden Ranch. Also on July 22, Sam leased to V Bar all his interest in oil, gas, and other hydrocarbons in the western 6,640 acres of the Cowden Ranch. Sam retained a one-eighth royalty and obtained the right, in lieu of a bonus, to acquire 25 percent of the lessees' working interest in each completed well upon payment of one-fourth of the development expenses. On August 25, 1965, a plan of reorganization was signed by Standard and Ted M. Kerr as trustee of the trust pursuant to which, on September 25, 1965, the outstanding 1,000 shares of V Bar were exchanged for 14,000 shares of Standard Oil Co. of California common stock. Shortly thereafter Standard liquidated V Bar.

Respondent asserts that the formation of V Bar had no business purpose and that the chronology of events beginning with the negotiations for the ranch/minerals exchange and ending with the liquidation of V Bar by Standard were all steps in a transaction whereby Earl made a lease of his oil and gas rights to Standard. The totality of events involved in this issue includes several significant aspects which must be carefully examined because the question presented is factual. *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950).

If the exchange of stock between Standard and V Bar is to be considered a reorganization, it must be shown that there was a business purpose for the organization of V Bar. *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *West Coast Marketing Corp.*, 46 T.C. 32, 40 (1966). Petitioners assert, and we believe, that V Bar was organized with the major purpose in mind of undertaking development of the oil and gas underlying the western end of the Cowden Ranch. During the spring of 1965, and clearly by June, the prospects for a ranch/mineral exchange had faded away, and, insofar as Earl knew, the prospects of doing business with Standard were remote. Humble Oil Co. in the meantime was producing from offsetting wells. Conse-

quently Earl would have to undertake drilling himself if he and his family were to realize anything on the mineral interests. To this end Earl established V Bar. We note that Earl had ample funds to support a program of drilling, and had indicated to his trustee that a portion of the funds was immediately available for such purpose. Earl, though primarily a cattleman, had had substantial experience in developing oil-producing properties. Just barely a year before the formation of V Bar, Earl had been seriously examining the cost and technical aspects of drilling on his property. The arrangement of a trustee running a corporation, which Earl chose to effectuate his intentions, was a perfectly reasonable selection under the circumstances. Oil and gas drilling is a high-risk business and a corporation would provide the desired limited liability to protect Earl's other assets. Since Earl was incapacitated with his cataract condition, it was desirable, from Earl's point of view, to have the trustee available who could actually perform the managerial and organizational details attendant to the development of the property.

A second business purpose for the creation of V Bar was the desire of Earl and his attorney to cure or at least ameliorate the title and royalty problems. The lease from petitioners to the trust and thence from the trust to V Bar, and the lease from Sam to V Bar could provide some basis for asserting that the normal royalty for the area was one-eighth and consequently did not include any additional amount received by Sam. Additionally V Bar provided a means for Sam to receive his desired extra amount in a different form, a portion of the working interest, which would not appear to be part of a royalty. Since Standard had not informed Earl of its decision to assume the risk of the ostensible cloud on his title, Earl could reasonably assume that the cloud presented a barrier to dealing with Standard and that he would have to proceed to develop the property himself.

To be sure V Bar did not undertake any actual development or business operations prior to the exchange of V Bar stock for Standard stock. However at the time V Bar was organized, Earl had not been able to find a ranch to his liking, and he did not know that Standard was willing to assume the risk of the putative cloud on his title. As far as Earl knew the ranch/minerals exchange was not a viable prospect. Although Earl's attorney William Monroe Kerr knew of the possibility of a stock exchange with Standard, the attorney had not informed Earl of this possibility. Thus when Earl executed the instruments creating the trust and V Bar, and placing the Cowden Ranch minerals in trust, he had no personal knowledge of any possible exchange of stock, and so could not have been establishing V Bar and the trust with that end in mind. Even when William Monroe Kerr informed Earl of the possibility of exchanging the V Bar stock for

Standard stock, Earl did not indicate any positive interest in the proposal until a month thereafter. When V Bar was formed and for a period thereafter, the prospect of a stock exchange was at best a possibility. Thus we conclude and hold that V Bar was organized for substantial business purposes, and that these purposes were the primary reasons and motivating factors for the formation of V Bar. See *Shaw Construction Co.*, 35 T.C. 1102, 1115 (1961); *Weyl-Zuckerman & Co.*, 23 T.C. 841, 847 (1955).

We are unable to agree with respondent that the 14-month series of events culminating when the stock exchange took place was a step transaction. Steps will be treated as part of a single transaction where they are part of an integrated scheme. *Helvering v. Limestone Co.*, 315 U.S. 179, 184, 185 (1942). The most significant test of such critical interrelatedness is whether the steps are so mutually interdependent that the legal relations created in one step would have been fruitless without completion of the others. *H. B. Zachry Co.*, 49 T.C. 73, 82 (1967); *American Bantam Car Co.*, 11 T.C. 397, 405 (1948), affirmed per curiam 177 F. 2d 513 (C.A. 3, 1949).

The initial negotiations and any agreement reached concerning the proposed ranch/minerals exchange had a significance independent from both the creation of V Bar, and the exchange of V Bar and Standard stock. The original arrangement between Earl and Standard was quite specific; the petitioners' interests in the minerals under the west end of the Cowden Ranch were to be exchanged for a ranch which Earl found suitable. To the extent that the V Bar-Standard stock exchange might be viewed as a transaction between Earl and Standard, it would be the granting of an oil and gas lease by Earl in receipt for shares of Standard stock. While the values involved in the proposed ranch/minerals exchange and in the stock exchange might be approximately the same, the nature of the consideration involved was different. The parties' efforts to consummate the proposed ranch/minerals exchange lapsed in the spring of 1965, and the deal was clearly beyond recall by that June. Had the deal still been viable, V Bar would not have been created. The exchange of stock between V Bar and Standard was different than and independent from the proposed ranch/minerals exchange, and was not carried out pursuant to an earlier commitment made in finalized negotiations prior to the creation of V Bar. See *Waltham Netoco Theaters, Inc.*, 49 T.C. 399 (1968), affd. 401 F. 2d 333 (C.A. 1, 1968); *Blueberry Land Co.*, 42 T.C. 1137 (1964), affd. 361 F. 2d 93 (C.A. 5, 1966); *Merkra Holding Co.*, 27 T.C. 82, 92 (1956).

The fact that there were business purposes for the incorporation of V Bar is an indication that its formation was not a step mutually interdependent with the subsequent stock exchange. *George A. Nye*,

50 T.C. 203, 212 (1968). We note that when V Bar was formed there was no commitment on the part of Standard to enter into a stock exchange. *John E. Palmer*, 44 T.C. 92, 95 (1965). The mere fact that the creation of V Bar and the stock exchange occurred close in time does not mean they are interrelated steps. *William C. Kind*, 54 T.C. 600, 608 (1970); *H. B. Zachry Co.*, *supra*, at 82, 83. Further, this conclusion logically follows from the fact that Earl did not know of the proposed stock exchange at the time he authorized the creation of V Bar. *Bruce v. Helvering*, 76 F. 2d 442, 443 (C.A. D.C., 1935), reversing 30 B.T.A. 80 (1934).

The intention underlying a questioned transaction is another criteria for determining whether the transaction is but a step in a single unified transaction. *H. B. Zachry Co.*, *supra* at 82. Since tax law deals with realities, we are here concerned with actual intent and not constructive, putative, or hypothetical intent. As noted earlier, Earl's attorney, William Monroe Kerr, knew of a possible stock exchange with Standard, and no doubt William Monroe Kerr was hopeful, and even optimistic, that his client would agree to such an exchange. Nevertheless, the decision was Earl's and his alone to make and the fact is that he was not informed about the possibility, and knew nothing of it at the time V Bar was formed. Consequently, when V Bar was organized, Earl could not have intended that the corporation was to be a step in the exchange of mineral rights for stock. For this reason and the others here stated, we find that V Bar was not brought into existence for use as a conduit when a transfer of minerals to Standard was imminent, and that the exchange of V Bar stock for Standard stock was a valid tax-free corporate reorganization within the meaning of sections 354(a)(1) and 368(a)(1)(B). See *West Coast Marketing Corp.*, *supra* at 40.

We turn now to our second issue: whether amounts received by petitioners from Standard during 1966 with respect to roads, flowlines, well locations, and tank batteries which Standard placed on the Cowden Ranch are taxable as ordinary income or capital gain. The lease between Earl and the trust and thus the lease from the trust to V Bar provided for certain fixed payments for the location of wells, flowlines, roads, and tank batteries on the surface covering the minerals leased. The payments were stated to be for "the surface easement herein granted." Petitioners treated the amounts received under this provision as payments for the sale of easements and included the payments in income as capital gain. Respondent contends the amounts were received as additional consideration for exploring, developing, and producing oil on petitioners' land, or as surface damages; in either event to be taxed as ordinary income.

Respondent centers his contention on the legal principle that a grant of minerals carries with it, as an essential appurtenance, the right to use so much of the surface as may be necessary to exploit the deposit. Invoking this principle, respondent asserts that Standard acquired by law the right to place wells and the other items on the surface of the land and that, accordingly, the payments made for the locations were in the nature of rent.

The general principle relied upon by respondent correctly reflects the law of Texas. *Harris* v. *Currie*, 142 Tex. 93, 176, S.W. 2d 302 (1944). This principle receives its broadest application where the lease or grant of minerals contains no provision dealing with surface. In such a case, a use of the surface reasonably necessary for the exploitation of the mineral deposit is implied. *Mid-Texas Petroleum Co.* v. *Colcord*, 235 S.W. 710 (Tex. Civ. App. 1921). However the grantor, by use of express language, may limit the surface easement or impose duties on the lessee of the minerals. *Warren Petroleum Corp.* v. *Monzingo*, 157 Tex. 479, 304 S.W. 2d 362, 65 A.L.R. 2d 1352 (1957). Additionally, the lessee, by express provision, can be required to pay for the use of the surface. *Meyer* v. *Cox*, 252 S.W. 2d 207 (Tex. Civ. App. 1952). Consequently, it appears that the payments here in question were received for the various facility locations as a result of specific agreement between the parties to the lease and not merely by operation of law for which no payment was required. This conclusion, however, does not resolve the question in petitioners' favor.

The right to locate wells and other facilities was granted in a lease, which, as it applies to Standard, ran for a period of 5 years and so long thereafter as oil, gas, or other hydrocarbons are produced from the specified land. The lease is to run for the life of the deposit. It is common knowledge that such deposits are exhaustible, and, indeed, this is the very basis of the allowance for depletion. *United States* v. *Ludey*, 274 U.S. 295, 303 (1927). This being the case, Standard's right to use the facility locations is certain to terminate sometime in the future, and petitioners, in effect, reserved a right of reversion in the various locations. Accordingly the payments petitioners received from Standard in 1966 for the location of wells, roads, flowlines, and tank batteries on the Cowden Ranch surface were in the nature of rent and taxable as ordinary income. *Fairmont Park Raceway, Inc.* v. *Commissioner*, 327 F. 2d 780, 784 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; *Lindley's Trust No. 1.* v. *Commissioner*, 120 F. 2d 998, 1000 (C.A. 8, 1941), affirming 42 B.T.A. 509 (1940) ; cf. *Redman L. Turner*, 47 T.C. 355, 362 (1967). Careful labeling by tax-conscious attorneys cannot serve as a chameleon to the operative facts.

We must next determine whether all or any of a $20,000 fee paid by Earl to Ted M. Kerr as trustee of Vest Trust No. 1 is deductible from ordinary income in 1965. Petitioner contends that the whole fee is deductible under section 212 [6] as an expense incurred for the production or collection of income, or for the management, conservation, or maintenance of income-producing property. Respondent asserts that deduction of the fee is to be totally disallowed because it was paid to the law firm of Kerr, Fitz-Gerald and Kerr for services in setting up the trust, it included compensation for future services, and a failure of proof by the petitioners that they are entitled to the claimed deduction under section 212. We must disagree with both parties. The fee cannot be singularly categorized as to nature and purpose and simply allowed or disallowed.

As respondent points out the fee was paid for future as well as present services. Additionally, Ted M. Kerr, in accordance with an arrangement with his partners in the law firm of Kerr, Fitz-Gerald and Kerr, was obligated to pay the fee over to his firm. The fee agreement was entered into and the fee paid after the exchange of V Bar stock for Standard stock. Thus to the extent the fee did not cover future services it was paid for work already performed. Concerning the creation of the trust and V Bar, the various lease transactions, and the reorganization with Standard, the facts reveal that Ted M. Kerr did very little compared with his brother and law partner William Monroe Kerr. The legal services bill submitted by the Kerr, Fitz-Gerald and Kerr firm to Ted M. Kerr, as trustee, amounted to $2,729.36. This is only slightly more than the $2,500 Earl paid the firm as an annual retainer in years prior to 1965. There is no showing that the firm performed the same amount of services in prior years as they did in 1965. Indeed the record indicates that William Monroe Kerr was considerably more involved in Earl's legal affairs in 1965 than in 1964.

Of that part of the fee paid to the Kerr, Fitz-Gerald and Kerr law firm, a portion was on account of legal services in the organization of V Bar and its reorganization with Standard. The costs of these services are capital in nature and in any event were incurred by Earl for the benefit of the corporation. Consequently they are not currently deductible but rather are a contribution to capital. Income Tax Regs. sec. 1.263(a)–2(f) ; *Dezso Goldner*, 27 T.C. 455, 463 (1956) ; *Jacob M. Kaplan*, 21 T.C. 134, 146 (1953). On the other hand a portion of the amount allocable to Kerr, Fitz-Gerald and Kerr for legal services

---

[6] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income ;

(2) for the management, conservation, or maintenance of property held for the production of income ; or

represents legal advice Earl received as a stockholder of V Bar in relation to his investment in the corporation, and as an owner of income-producing property concerning the exploitation of such property. This portion is deductible from petitioners' 1965 income under section 212. *Nancy Reynolds Bagley*, 8 T.C. 130, 135 (1947).

Ted M. Kerr was not merely an idle conduit and, as trustee, did render some services in 1965. Amounts attributable to such services are deductible in that year. Income Tax Regs. sec. 1.212–1(i). Although, under the trustee's fee agreement, some of the amount paid the trustee was for future services, the whole amount allocable to the trustee is nonetheless deductible. The payments for future services were not deposits which would be repaid if no services were performed. The petitioners were on the cash basis of accounting and the money paid for future services was irretrievably spent. Consequently, it is deductible from their 1965 income. Compare *John Ernst*, 32 T.C. 181, 185–186 (1959), with *Tim Lillie*, 45 T.C. 54, 63, affd. 370 F. 2d 562 (C.A. 9, 1966).

The parties have made no effort to allocate the fee according to the various elements here discussed, rather the parties have merely asserted their polar positions. Consequently it falls to this Court to apportion the fee according to its constituent elements. *Cohan* v. *Commissioner*, 39 F.2d 540, 543–544 (C.A. 2, 1930); *Estate of A. P. Steckel*, 26 T.C. 600, 609 (1956), affirmed per curiam 253 F.2d 267 (C.A. 6, 1958). Making our best judgment in light of the evidence available, we conclude that $10,000 was expended for the benefit of V Bar and is thus a nondeductible capital contribution. Earl expended $8,000 for legal advice in connection with the management, conservation, or maintenance of income-producing property, which expenditure is deductible in 1965 under section 212. The amount actually attributable to trustee services is $2,000, and this amount is also deductible in 1965 under section 212.

The fourth and final matter we must consider is whether an agreement between petitioners and the Shell Oil Co. was a disposition of water rights and a perpetual easement such that payments made pursuant to the agreement constitute capital gain, or whether the agreement was instead a lease of water rights generating ordinary income.

The question of whether there was a sale or a lease of the water rights is to be determined according to the principles governing the field of oil and gas taxation. *Don C. Day*, 54 T.C. 1417, 1422 (1970). Thus an answer to our question will turn on whether petitioners have, under the agreement with Shell, retained an economic interest in the water covered by the agreement. *Wood* v. *United States*, 377 F.2d

300, 303–304 (C.A. 5, 1967). An economic interest occurs where a taxpayer has acquired, by investment, an interest in a natural resource in place, and secures, by some legal relationship, income, derived from extraction of the resource, which provides the taxpayer with a return of his capital. *Palmer* v. *Bender*, 287 U.S. 551, 557 (1933). Respondent contends that petitioners retained an economic interest in the water in place, because payments under the agreement were based on production, and a reversionary interest was kept by petitioners. The facts do not support respondent's contention.

The agreement makes clear that Shell acquired the right to all the water between 3,000 and 6,500 feet under petitioners' land. The only limitation on the grant was that petitioners reserved the right to so much of the water as might be required in producing minerals from the land in question. This small reservation makes the grant of the water no less complete. *Don C. Day*, *supra* at 1424.

No downpayment was called for by the agreement. The purchase price is required to be paid in monthly installments over a period of 75 years. The monthly installments are not of a fixed amount, but rather are determined according to water produced by Shell from not only petitioners' land but also certain specified lands in the surrounding area, and according to the flow through any pipeline Shell might construct over petitioners' land. It has been said that "A bare right measured by production does not constitute an economic interest." *Commissioner* v. *Remer*, 260 F. 2d 337, 340 (C.A. 8, 1958), affirming 28 T.C. 85 (1957). This principle applies *a fortiori* where the right is measured not only by production from the water rights transferred by the agreement under consideration, but also by production from other sources and by the mere transit of water through pipelines. On occasion the absence of a substantial downpayment has been seen as an indication that a transaction is a lease rather than a sale. E.g., *Puckett* v. *Commissioner*, 355 F. 2d 551 (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court. However, there is no general requirement under the Code that there be a sizable or any downpayment for a transaction to qualify as a sale. Cf. sec. 453. Here, an economic interest in the natural deposit was not retained; the absence of a downpayment is without major significance.

A taxpayer having an economic interest must not only look to extraction of the natural deposit for the return of his capital, but he must rely solely on that source. *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308, 314 (1956). In this case the amounts to be paid under the agreement were determined not according to water produced by Shell from petitioners' land but from water produced by Shell from surrounding lands, and water transported through any pipelines constructed pursuant to the agreement. Thus the payments

due under the agreement were not directly related to production from the water rights covered by the agreement. Indeed, to date Shell has undertaken no production of water from petitioners' land although, during the years in issue, petitioners received payments each year. So it is clear that petitioners were not looking solely to exploitation of the water for a return of their capital. In the agreement Shell explicitly stated that its intention was to obtain a water reserve. There was no specific requirement that Shell undertake production from the water rights granted. These facts fortify the conclusion that petitioners were not attempting to secure exploitation of the water rights but rather conveyed the water in place. *Maude W. Olinger*, 27 T.C. 93, 97 (1956).

The agreement gives Shell the option of abandoning the water rights if the water from sources upon which the monthly purchase price payments are determined averaged less than 50,000 barrels per day for 6 months. Since the petitioners have not retained an economic interest in the water in place, the presence of a reverter clause such as this is not inimical to a conclusion that petitioners effected a sale rather than a lease of the water underlying their land. See *Helvering v. Elbe Oil Land Co.*, 303 U.S. 372 (1938); *Don C. Day, supra* at 1427.

Respondent also contends that petitioners did not sell Shell an easement but rather only leased a right of way. We note, however, that although the amount of each monthly payment was not fixed, the duty to make payments is to terminate on a specified date after which Shell will continue in possession of the easement. Thus Shell was acquiring a permanent interest in the property for the payments made. *Quartzite Stone Co.*, 30 T.C. 511, 518 (1958), affd. 273 F. 2d 738 (C.A. 10, 1959). In any event the transfer of the easement was an indivisible part of the agreement with Shell, and this Court will not split it off to produce an artificial result for the taxation of the proceeds received under the agreement. *A. C. Burton & Co.* v. *Commissioner*, 190 F. 2d 115, 118 (C.A. 5, 1951), reversing on the facts 14 T.C. 290 (1950); *Western Wine & Liquor Co.*, 18 T.C. 1090, 1096 (1952). So we determine that in 1963 petitioners sold an easement as well as water rights to Shell, and that the payments received in 1965, 1966, and 1967 pursuant to the agreement are taxable as capital gains.

In accordance with the foregoing,

*Decision will be entered under Rule 50.*