WEST COAST MARKETING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 126–65.   April 18, 1966.

---

*Bernard A. Wieder*, for the petitioner.
*James D. Burroughs*, for the respondent.

The Commissioner determined a deficiency in petitioner's income tax for the fiscal year ended June 30, 1960, in the amount of $50,911.97.

The sole issue is whether the substance of a certain transaction was a taxable sale or exchange by the taxpayer of its interest in certain land or whether the realized gain in respect thereof is to escape taxation under section 354(a)(1) of the 1954 Code through the use of an intermediate corporation to which such property was first transferred.

### FINDINGS OF FACT

Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference.

Petitioner, a Florida corporation, filed its Federal income tax return for the fiscal year ending June 30, 1960, with the district director of internal revenue, Jacksonville, Fla.

Max B. Cohen is the sole stockholder and president of petitioner. His principal business was farming, but he has not farmed since 1955. He had formed petitioner in 1936 and transferred his farm lands to it. These lands are located in Manatee County, Fla.

On January 4, 1956, Cohen entered into contractual arrangements to purchase about 12,000 acres of land in Hillsborough County, Fla., from C. W. Palmore and his wife. The total acreage involved was considered for convenience as comprising three parts, referred to respectively as the North Tract, the Middle Tract, and the South Tract; and the foregoing contractual arrangements took the form of three separate agreements, each with respect to one of these tracts.

The North Tract contained approximately 4,450 acres, the South Tract approximately 3,000 acres, and the Middle Tract approximately 4,500 acres. Pursuant to the terms of each agreement, Cohen deposited in escrow $10,000 for each of the three tracts, or a total of $30,000.

The purchase price of the land in all three agreements was $100 per acre and the deposit of $10,000 for each of the three tracts was to be applied toward the purchase price of such tract at the time of closing.

Subsequent to the execution of these agreements, Cohen assigned his interest in the Middle Tract to petitioner.

By warranty deed dated July 12, 1956, and recorded on July 13, 1956, the Palmores transferred title to the Middle Tract to petitioner, which contemporaneously executed a mortgage therefor in respect of its remaining obligation in the approximate amount of $319,704.

Sometime prior to September 1956, George Coury, a banker and stockbroker, learned that Cohen was having difficulty in obtaining funds to consummate the purchase of the North and South tracts of land and that he might be "amenable to a partner." Coury was familiar with the property comprising all three tracts and wished to obtain an interest therein for speculative purposes of resale. He met with Cohen and concluded a deal whereby he would acquire an undivided one-half interest in the options or agreements which Cohen held in respect of the North and South tracts and an undivided one-half interest in the Middle Tract itself which was owned by petitioner. That deal was formalized in a contract dated September 19, 1956, between Cohen, petitioner, and Coury. In that contract Coury agreed to pay Cohen $150,000 (calculated at the rate of $25 an acre for 6,000 acres, being one-half of the total estimated acreage of the three tracts) as a bonus or premium in order to enable him to purchase an undivided one-half interest in the three tracts. At the same time the petitioner agreed to convey to Coury an undivided one-half interest in the Middle Tract for $64,667.17, representing one-half of petitioner's actual investment in that property, and Coury agreed to assume and pay one-half of petitioner's obligations under the mortgage which it had given in respect of the Middle Tract. In addition, the contract provided for an assignment by Cohen to Coury of an undivided one-half interest in the two executory agreements covering the North Tract and the South Tract for $10,000, representing one-half of the deposits theretofore made by Cohen on those two agreements; and Cohen and Coury each agreed further to contribute one-half of the money required to close those two purchase agreements.

The foregoing contract of September 19, 1956, also contained, among others, the following provisions:

4. In the event that either of the parties to this agreement, or their respective nominees, receives a bona fide offer to purchase any one or more of the three tracts covered by this agreement, or any part or parts thereof, which offer in his or its opinion should be accepted, he or it shall forthwith transmit said offer in writing to his or its tenant in common at the address hereinafter set forth. Thereafter, the tenant in common receiving said notice shall have a period of thirty days within which to either approve said third party offer or to meet the terms of said third party offer by purchasing the interest of the other tenant in common at the same price and terms offered by said third party.

\*     \*     \*     \*     \*     \*     \*

7. It is understood and agreed between the parties hereto that either Cohen or Coury may assign his interest in the contracts herein described to a corporation formed, or to be formed, by them, or either of them, and title to the real property described in this agreement may become vested in said corporation or corporations, * * *

Coury's intention at the time he entered into this agreement was to resell the land for profit. He did not intend to farm the land with Cohen. The record contains no convincing evidence that Cohen ever intended to farm any of these lands, either individually, or through petitioner, or otherwise, or that they were acquired and held for any purpose other than to resell at a profit.

Pursuant to paragraph 7, above, title to Coury's one-half interest in each of the three tracts was taken by each of three corporations, respectively, controlled by Coury and unnamed associates to whom he referred collectively as his "syndicate." Thus, on September 24, 1956, the Palmores transferred title to the South Tract to Cohen and Coury-Florida Land and Oil Corp.; on December 28, 1956, the Palmores transferred title to the North Tract to Cohen and George Coury Land Co.; and on January 31, 1957, petitioner transferred an undivided one-half interest in the Middle Tract to Amelia Coury Holding Co.

As of February 1, 1957, petitioner and Amelia Coury Holding Co. each owned an undivided one-half interest in the Middle Tract; Cohen and George Coury Land Co. each owned an undivided one-half interest in the North Tract; and Cohen and Coury-Florida Land & Oil Corp. each owned an undivided one-half interest in the South Tract.

In August 1957, Coury learned that Cohen was having some financial difficulties and desired to sell half of his interest in the three tracts of land in order to meet certain obligations.

Under date of August 14, 1957, an agreement was entered into wherein petitioner and Cohen, referred to as vendors, agreed to sell, and Coury, referred to as vendee but acting as nominee for Joseph T. Maroon, trustee, agreed to buy, for $375,000, 50 percent of the vendors' undivided one-half interest in the North Tract, South Tract, and Middle Tract. Paragraph 8 of the agreement contained the following provision:

8. The vendors and the vendee are parties to a certain agreement dated September 19, 1956, as amended, and by execution of the instant agreement, the parties hereto ratify and confirm in every particular the agreement of September 19, 1956, as amended, and the vendee agrees that his nominee shall be bound by the terms thereof as fully and completely as though said nominee was a party to the original agreement.

Joseph T. Maroon was trustee or nominee for beneficiaries Hoke T. Maroon, George E. Mayer, Walter A. Frederick, and Argentina D. Schroder, each of whom held an undivided one-quarter interest in

the property acquired by Joseph T. Maroon, as trustee, as hereinafter set forth.

On August 15, 1957, pursuant to the foregoing agreement, petitioner sold an undivided one-half of its interest in the Middle Tract to Joseph T. Maroon, as trustee, and at about the same time Cohen and his wife sold an undivided one-half of their interest in the North and South tracts to Joseph T. Maroon, as trustee.

As of August 15, 1957, the parties owning undivided interests in the three tracts and the percentage owned by each of them were as follows:

| *Middle Tract* | *Interest (percent)* |
| --- | --- |
| West Coast Marketing Corp | 25 |
| Joseph T. Maroon, as trustee | 25 |
| Amelia Coury Holding Co | 50 |

| *South Tract* | |
| --- | --- |
| Max B. Cohen | 25 |
| Joseph T. Maroon, as trustee | 25 |
| Coury-Florida Land & Oil Corp | 50 |

| *North Tract* | |
| --- | --- |
| Max B. Cohen | 25 |
| Joseph T. Maroon, as trustee | 25 |
| George Coury Land Co | 50 |

As previously noted, Coury was interested in selling the three tracts at a profit. He was acquainted with Louis E. Wolfson, who was the largest stockholder in Universal Marion Corp. (Universal), a publicly held corporation, and who appeared to have a dominant influence in its affairs. In February 1959 Coury suggested to Wolfson the possibility of Universal's acquiring and developing the three tracts. A few days later, at Wolfson's request, Leon Kaye, vice president in charge of land for Universal, went to see Coury about the property. After talking with Coury, he inspected the property and was impressed by its potential. Wolfson subsequently called Coury and a meeting was arranged at Wolfson's home. At that meeting, which was held in early March of 1959, an oral agreement was reached as to the terms upon which Coury would be willing to sell. The price was $360 an acre, payable in preferred stock of Universal. Wolfson told Coury that they "had a deal" but that it "had to go through the company."

Coury's negotiations with Wolfson and other representatives of Universal related to all the ownership interests in the three tracts and not merely to the undivided one-half interests held by his corporations. However, Coury did not at first inform Cohen about those negotiations because he had no concrete proposal to relate to Cohen, and since he found Cohen "difficult to do business with," he was apprehensive that they "might not make the trade if Mr. Cohen joined in at

the bargaining table." But immediately after the foregoing meeting with Wolfson in early March 1959, Coury informed Cohen and the other owners of interests in the property about the negotiations and the terms upon which a sale could be consummated. Cohen was anxious to sell and he authorized Coury to "go ahead and negotiate" the proposed deal.

On April 16, 1959, in a letter addressed to Coury, James Mullaney, the president of Universal, made a formal offer to purchase the land comprising the three tracts at $360 an acre, payable in preferred stock of Universal. The terms set forth in the letter were those which had already been agreed upon orally in the meeting at Wolfson's home. The letter read in part as follows:

Mr. Leon Kaye has been in touch with me with respect to the negotiations which he has carried on with you on your own behalf and on behalf of the other owners of 12,000 acres of land in Hillsborough County, Florida, six miles east of Ruskin.

Subject to the approval by our Board of Directors at a meeting to be held on Wednesday, April 22, 1959, at 2:30 P.M., we hereby offer to acquire said tract of land upon the following terms and conditions:

1. In exchange for good and marketable title in, of, and to said land, we will deliver to you and such owners 4½% voting first preferred stock of this company, of $100. per share par value, convertible after two years after date of issuance, at $22.00 per share and annually thereafter at $1.00 additional per share. The dividends at 4½% will be paid semi-annually. Other features of said stock are that a sinking fund of 3⅓% per annum will be provided for and said stock will be callable after three years after date of issuance at $103, and each year thereafter at 12½¢ less each year until the call price is $100. It is contemplated that said shares of convertible preferred stock will be registered upon appropriate Exchanges when able to qualify according to regulations thereof.

2. The price at which such exchange shall be made shall be $360. per acre.

3. You shall furnish such abstracts of title, title insurance, survey or other title papers as shall be reasonably required by our counsel, showing that you have good and marketable title in his opinion free and clear of all defects, encumbrances, or exceptions.

  *   *   *   *   *   *   *

Of course, this offer must necessarily be subject to the approval by our stockholders of the appropriate charter amendment authorizing the issuance of the preferred stock contemplated hereby.

  *   *   *   *   *   *   *

We have discussed the proposed exchange of our convertible voting preferred shares for shares of your corporation or corporations owning said land and counsel has advised us that generally speaking such exchange would be tax-free.

It is necessary that we have your acceptance or rejection of this offer by the time of our said Board meeting to be held on April 22, and such acceptance should be accompanied by appropriate evidence of your authority to so accept on behalf of owners other than yourself.

After receipt of the letter of April 16, 1959, Coury immediately secured the oral consent of Cohen, petitioner, and the other parties

in interest to consummate the deal. After obtaining their consent, Coury wrote the following letter to James Mullaney on April 17, 1959:

Thanks for your letter which in substance is the understanding between Mr. Kaye and myself regarding our 12,000 acres at Tampa.

Mr. Kaye may have told you the seller to us retained one-half of the mineral rights. These mineral rights are now in an estate and after having discussed the matter with the attorney for the estate, I am of the opinion that it will not be possible for us to have an answer on the minerals prior to the meeting of your board on April 22nd. I am even afraid that it is going to be a week or more following this date before this problem will be resolved.

I discussed the situation today with Mr. Kaye and he suggested that I write you accordingly and of course, we will do every thing with in our power to obtain a release of the minerals as soon as possible.

Proceeding on the basis that eventually we will get the release on the mineral rights, we are going ahead with your other requests and I will keep in touch with Mr. Kaye.

A meeting of the board of directors of Universal was held on April 22, 1959, at which meeting the president was authorized and directed to do any and all things and execute any and all instruments necessary to consummate the acquisition of the 12,000 acres of land on the terms set forth in his letter of April 16, 1959, to Coury.

The final sale of all three tracts of land to Universal was consummated in the fall of 1959, in accordance with the terms of the letter of April 16, 1959.

Meanwhile, however, Cohen caused to be organized on April 30, 1959, a Florida corporation named Manatee Land Co. (Manatee), and, on May 1, 1959, he and petitioner transferred to Manatee their remaining respective one-fourth interests in the three tracts—petitioner's in the Middle Tract and Cohen's in the North and South tracts.

Petitioner received 645 shares of the stock of Manatee for its undivided one-quarter interest in the Middle Tract. Cohen received the remaining 769 shares of Manatee stock for his undivided one-quarter interest in the North and South tracts.

Subsequent to the issuance of the 1,414 shares of stock to the petitioner and Cohen, Manatee issued two shares to William B. McKechnie and two additional shares to Donald E. Thurlow. Payment was made for these four shares of stock in cash on the basis of $100 per share.

Petitioner originally acquired the Middle Tract for a purchase price of $449,400. The basis of the petitioner in its remaining one-fourth undivided interest in the Middle Tract was $112,350, computed as follows:

| | |
|---|---|
| Original cost of Middle Tract | $449,400. |
| Less: one-half interest to Coury group | 224,700. |
| Basis of one-half undivided interest | 224,700. |
| Less: one-half of remaining undivided interest | 112,350. |
| Basis of one-fourth undivided interest | 112,350. |

In carrying out the terms of the agreement for the sale or exchange of the three tracts of land as proposed in the letter of April 16, 1959, the stockholders of Manatee, on October 27, 1959, transferred their stock in the corporation to Universal in exchange for 10,800 shares of Universal's 4½ percent $100 par value voting cumulative preferred stock. The number of shares of Universal stock received by each of the stockholders of Manatee was as follows:

| Stockholder | Number of shares |
|---|---|
| Petitioner | 4,913 |
| Max B. Cohen | 5,857 |
| William B. McKechnie | 15 |
| David Thurlow [1] | 15 |

[1] The stipulation of facts refers to the issuance of Manatee stock to "Donald E." Thurlow and thereafter to the distribution of Universal stock to "David" Thurlow. There is no explanation for the apparent discrepancy, and there is no indication whether there are two different persons or whether there is a typographical error in the stipulation.

Manatee was not engaged in the conduct of any business. It was used by petitioner and Cohen for no purpose other than to hold title to their respective undivided one-fourth interests in the three tracts of land, and to serve as a conduit for transferring title thereto to Universal.

On December 18, 1959, Manatee was liquidated by Universal.

In its income tax return for the year ended June 30, 1960, petitioner reported the transfer of all of the stock which it owned in Manatee in exchange for 4,913 shares of Universal "having an indeterminate market value" and did not report any taxable income from that transaction. Those shares in fact had a fair market value of $67 per share, as stipulated by the parties herein. The Commissioner determined that petitioner realized a long-term capital gain of $203,647.91 "on the exchange in form of stock of Manatee Land Co. for stock of Universal Marion Corporation" and increased the taxable income reported in its return by that amount.

## OPINION

RAUM, *Judge:* If petitioner had transferred its one-fourth interest in the Middle Tract directly to Universal in exchange for the preferred shares of Universal, there is no dispute that the resulting gain would have been taxable. Counsel for the parties so agreed at the trial.[1] Is a different result required by the use of Manatee, an in-

[1] "The COURT: Is there any dispute among the parties as to what the legal consequences would have been had the Petitioner transferred its property interest directly to Universal * * * rather than through the intermediate use of the other corporation?
Mr. WIEDER [petitioner's counsel] : I don't think there is, your Honor.
The COURT: Would that have been a taxable or nontaxable transaction?
Mr. BURROUGHS [Government counsel] : It would have been a taxable transaction, your Honor, from the standpoint of the Respondent.
The COURT: And the Petitioner so agrees?
Mr. WIEDER : Yes, sir."

termediate agency that was employed to effectuate the transfer? On this record, we think the answer must be no.

Petitioner's position has been that Manatee was organized for a bona fide business purpose and that the transfer of its stock to Universal in exchange for stock of the latter constituted a tax-free "reorganization" under sections 354(a)(1) and 368(a)(1)(B) of the 1954 Code.[2] To be sure, the transaction before us falls literally within those provisions. But if Manatee served no business purpose and the substance of the transaction was simply an exchange of land for stock of Universal, the tax consequences must turn upon the substance of the transaction rather than the form in which it was cast. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613. In such circumstances there would not be any bona fide "reorganization" to which the nonrecognition provisions in question could apply.[3] *Gregory* v. *Helvering*, 293 U.S. 465. What was the situation here?

Cohen testified before us in an effort to show that there were bona fide business reasons for incorporating Manatee and transferring to it his and petitioner's respective undivided one-quarter interests in the three tracts. We found his testimony slippery and unconvincing. The burden was upon petitioner and it has not been carried. To the contrary, the record persuasively indicates that Manatee was incorporated for the purpose of being used as a conduit for passing title to petitioner's and Cohen's interests in the three tracts to Universal.[4]

Manatee was brought into existence when the sale of the land was imminent. Petitioner's and Cohen's interests in the land were trans-

---

[2] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

  (a) GENERAL RULE.—

    (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

  (a) REORGANIZATION.—

    (1) In General.—For purposes of parts I and II and this part, the term "reorganization" means—

    \*     \*     \*     \*     \*     \*     \*

    (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

[3] See Income Tax Regulations, sec. 1.368–1(b): "a sale is nevertheless to be treated as a sale even though the mechanics of a reorganization have been set up."

[4] The record shows, in addition, that a small minority interest (less than three-tenths of 1 percent in the aggregate) in Manatee was acquired by two persons named McKechnie and Thurlow, not otherwise identified. However, there is no evidence as to what part, if any, these persons played in the transaction or whether their interests represented anything more than mere window dressing. In the circumstances, since the burden was upon petitioner, we do not give any substantial weight to their participation in the transaction.

ferred to it. It engaged in no business and served no purpose other than to hold title pending the contemplated transfer to Universal. We reject as unworthy of belief any testimony that might be construed as suggesting that it had any other purpose.

All of the steps taken by petitioner and Cohen were but component parts of a single transaction the substance of which was a taxable disposition by them of their property interests to Universal. Accordingly, the Commissioner did not err in including in petitioner's taxable income, the long-term capital gain which it realized in that transaction. *Gregory* v. *Helvering*, 293 U.S. 465; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *John E. Palmer*, 44 T.C. 92; *Virginia W. Stettinius Dudley*, 32 T.C. 564, affirmed per curiam 279 F. 2d 219 (C.A. 2); *Nicholas Jacobs*, 21 T.C. 165, affirmed 224 F. 2d 412 (C.A. 9); *Electrical Securities Corporation*, 34 B.T.A. 988, affirmed 92 F. 2d 593 (C.A. 2).

*Decision will be entered for the respondent.*