108 T.C. No.6


UNITED STATES TAX COURT


TRINOVA CORPORATION AND SUBSIDIARIES, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2931-94.                    Filed February 27, 1997.

P, a corporation, filed a consolidated tax return
with its affiliated companies.  P operated a division
with assets that included certain section 38 assets
upon which investment tax credits (ITC) had been
claimed.  P transferred the division assets to a wholly
owned subsidiary, G.  P agreed to transfer its shares
in G to another shareholder, H, in return for H's
shares in P.  The two transactions qualified for
nonrecognition status under secs. 351, 355, and
368(a)(1)(D), I.R.C.  R determined a deficiency for P's
failure to include ITC recapture in income under sec.
47(a), I.R.C., on its 1986 consolidated tax return,
relying on Rev. Rul. 82-20, 1982-1 C.B. 6.  Sec.
1.1502-3(f)(2) and (3), Income Tax Regs., particularly
<u>Example (5)</u> thereof, provides for no recapture.  <u>Held</u>:
Rev. Rul. 82-20, 1982-1 C.B. 6, is an unwarranted
attempt to limit the scope of the regulations; no ITC
recapture is includable in P's income.

Frederick E. Henry, Jeffrey M. O'Donnell, and Julie C. H. Walsh, for petitioners.

Nancy B. Herbert and Reid M. Huey, for respondent.

OPINION

TANNENWALD, Judge:  Respondent determined the following deficiencies in petitioner's Federal income taxes and additions to tax:

| Year | Deficiency | Addition to Tax Sec. 6661(a) |
|------|------------|------------------------------|
| 1985 | $   117,988 | -- |
| 1986 | 11,630,928 | $1,429,687 |
| 1987 | 4,924,255 | -- |
| 1988 | 834,875 | -- |

After concessions, the issue for decision is whether petitioner is liable for recapture in 1986 of investment tax credits (ITC) claimed on certain section 38[1] assets that were transferred to a wholly owned subsidiary, the stock of which was then transferred out of the consolidated group in a tax-free transaction.  If this issue is resolved in favor of respondent, then the issue of the addition to tax under section 6661(a), which relates only to the recapture issue, will have to be decided.[2]

_____

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  An additional issue, relating to the allocation of deductions
                                        (continued...)

Background

This case was submitted fully stipulated under Rule 122. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference and found accordingly.

Petitioner, an accrual basis taxpayer, had its principal offices in Maumee, Ohio, at the time it filed its petition herein. Petitioner changed its name to Trinova from the Libbey-Owens-Ford Company (LOF) on July 31, 1986. Petitioner timely filed a consolidated Federal income tax return with certain of its subsidiaries for the years at issue with the Internal Revenue Service Center, Cincinnati, Ohio, or the Internal Revenue Service office in Toledo, Ohio. Petitioner was engaged in the fluid power and plastics businesses, and in the manufacture of glass. The glass business was referred to as the "LOF Glass Division".

One of LOF's largest shareholders was Pilkington Brothers (Pilkington), an English company, which owned 29 percent of petitioner's common stock through its wholly owned U.S. subsidiary, Pilkington Holdings, Inc. (Pilkington Holdings). Two of petitioner's fourteen directors were associated with Pilkington. In late 1985, Pilkington approached LOF and began negotiations concerning the possibility of acquiring the glass business.

_____

[2](...continued)
between subpart F income and non-subpart F income, will be decided later by a separate opinion.

Earlier that year, on July 25, 1985, the board of directors of LOF approved the transfer of the glass business to a wholly owned subsidiary for valid business reasons. On February 19, 1986, LOF Glass, Inc. was incorporated as a wholly owned subsidiary of LOF. On March 6, 1986, a "Transfer and Assumption Agreement", amended on April 25, 1986, transferred to LOF Glass, Inc., all assets associated with the LOF Glass Division, including inventories and receivables, effective retroactively to February 19, 1986. These assets also included section 38 assets upon which LOF had previously claimed ITCs. Petitioner took no formal action contemplating the liquidation of LOF Glass, Inc., in the event that the acquisition by Pilkington did not take place.

On March 7, 1986, LOF, Pilkington, and Pilkington Holdings entered into an agreement, amended on April 28, 1986, whereby LOF would transfer all of its shares of LOF Glass, Inc., to Pilkington Holdings in exchange for all of the shares of petitioner held by Pilkington Holdings. On April 28, 1986, Pilkington Holdings exchanged 4,064,550 shares of LOF for the shares of LOF Glass, Inc. LOF Glass, Inc., continued to operate the glass business as a subsidiary of Pilkington Holdings and used the section 38 assets in its trade or business.

The parties have stipulated that petitioner recognized no gain or loss upon the transaction whereby its glass business was transferred to LOF Glass, Inc., pursuant to the provisions of

section 351 or sections 354, 355, and 368(a)(1)(D) (except as required by such sections or section 357(c)), and that pursuant to section 355 neither petitioner nor Pilkington Holdings recognized any gain or loss upon the exchange of LOF Glass, Inc., shares for the LOF shares.

Before February 19, 1986, income, deductions, and credits with respect to the LOF Glass Division were included in petitioner's return.  From February 19, 1986, through April 28, 1986, deductions and credits with respect to LOF Glass, Inc. (the subsidiary), were included as part of petitioner's consolidated return.  After April 28, 1986, LOF Glass, Inc., was no longer part of petitioner, petitioner's affiliated group, or petitioner's consolidated Federal income tax return.

On its 1986 consolidated return, petitioner did not include any amount of ITC recapture with respect to the LOF Glass, Inc., section 38 assets.  Respondent determined that a $5,718,749 ITC recapture arose from the April 1986 transaction.  Petitioner does not dispute the amount of the ITC recapture, should the Court hold petitioner liable for it.

Discussion

The investment tax credit provisions, now repealed but in effect in respect of the taxable year 1986, provided for a tax credit to taxpayers purchasing certain types of property for use in their businesses.  Whether petitioner is required to recapture its investment tax credit turns upon the impact of a revenue

ruling on what other otherwise appears to be unqualified language of a consolidated return regulation. The issue is not new to this Court whose position has been rejected by two Courts of Appeals. By way of background to our resolution of this judicial conflict, we first turn to a description of the provisions in respect of the investment tax credit pertinent to our analysis.

Section 47(a)(1) provided for recapture of the investment tax credit:

> If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38 * * * [3]

Section 47(b) further provided:

> For purposes of subsection (a), property shall not be treated as ceasing to be section 38 property with respect to the taxpayer by reason of a mere change in the form of conducting the trade or business so long as the property is retained in such trade or business as section 38 property and the taxpayer retains a substantial interest in such trade or business.

Section 47 sets out two prongs for the "mere change in the form" test--first, a continuing trade or business, and second, a retained substantial interest. The transactions herein clearly satisfy the continuing trade or business requirement. However,

---

[3] Sec. 47(b)(2) provided an exception for certain types of reorganizations which is not applicable herein (and the parties do not argue otherwise) because the assets transferred to LOF Glass, Inc., did not constitute substantially all of the assets of petitioner. See Baicker v. Commissioner, 93 T.C. 316, 326 (1989).

after the transaction in question, petitioner no longer had any interest in its former glass business; LOF Glass operated as a subsidiary of Pilkington Holdings.  Thus, if section 47 were the only provision involved in this case, this lack of retained interest would be fatal to petitioner's position herein.  Blevins v. Commissioner, 61 T.C. 547 (1974); Aboussie v. Commissioner, 60 T.C. 549 (1973), affd. without published opinion 504 F.2d 758 (5th Cir. 1974); Soares v. Commissioner, 50 T.C. 909 (1968); Purvis v. United States, 73-1 USTC par. 9157 (N.D. Ga. 1972).

However, the transactions herein took place in the consolidated return context, which provides a different frame of reference.  Paragraph (f) of section 1.1502-3, Income Tax Regs., deals with early dispositions of section 38 assets of a member of a consolidated group; subparagraph (2) of paragraph (f) provides:

> (2)  * * * a transfer of section 38 property from one member of the group to another member of such group during a consolidated return year shall not be treated as a disposition or cessation within the meaning of section 47(a)(1).  If such section 38 property is disposed of, or otherwise ceases to be section 38 property * * * before the close of the estimated useful life * * *, then section 47(a)(1) or (2) shall apply * * *

Subparagraph (3) of paragraph (f) provides:

> (3)  Examples.  The provisions of this paragraph may be illustrated by the following examples:

> Example (1).  P, S, and T file a consolidated return for calendar year 1967.  In such year S places in service section 38 property having an estimated useful life of more than 8 years.  In 1968, P, S, and T file a consolidated return, and in such year S sells

such property to T.  Such sale will not cause section
47(a)(1) to apply.

                *   *   *   *   *   *   *

     Example (3).  Assume the same facts as in example
(1), except that P, S, and T continue to file
consolidated returns through 1971 and in such year T
disposes of the property to individual A.  Section
47(a)(1) will apply to the group * * *

                *   *   *   *   *   *   *

     Example (5).  Assume the same facts as in example
(1), except that in 1969, P sells all the stock of T to
a third party.  Such sale will not cause section
47(a)(1) to apply.

It is clear that the mere transfer of section 38 assets

within a consolidated group does not trigger recapture.  Sec.

1.1502-3(f)(2), Income Tax Regs.; see also sec. 47(b); Tandy

Corp. v. Commissioner, 92 T.C. 1165 (1989); sec. 1.47-3(a),

Income Tax Regs.

     It is equally clear from Example (3) of the regulations that

a transfer of the section 38 assets by LOF Glass, Inc., to

Pilkington Holdings would have triggered the recapture of the

investment tax credit.  In the same vein, the language of Example

(5) without more would dictate that the transfer of the stock of

LOF Glass, Inc., to Pilkington Holdings would not trigger the

recapture of such credit.  In point of fact, the application of

Example (5) to the instant case is affected by a revenue ruling

and the opinions of two Courts of Appeals approving that ruling.

In order to facilitate an understanding of the positions of the

parties and our views in respect thereto, we shall first discuss the ruling and the two Courts of Appeals opinions.

In Rev. Rul. 82-20, 1982-1 C.B. 6, section 38 assets were, pursuant to a prearranged plan, transferred by the parent corporation to a subsidiary within a consolidated group in exchange for stock of the subsidiary. Immediately thereafter, the stock of the subsidiary was distributed to one of the two shareholders in exchange for his stock in the parent. It was assumed that the subsidiary would continue to use the section 38 assets in the same trade or business. Although the ruling recognized that the transactions qualified under sections 355(c)(1) and 368(a)(1)(D), it held that the ITC recapture provision of section 47(a)(1) applied on the ground that there was a planned transfer of the property outside the group. Without making any reference to Example (5), the ruling reasons:

> Although section 1.1502-3(f)(2)(i) of the regulations creates an exception for transfers of section 38 property between members of a consolidated group that would otherwise be dispositions under section 47(a)(1), the exception is premised on the assumption that the property is remaining within the consolidated group. When there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions. * * * [Rev. Rul. 82-20, 1982-1 C.B. 7.]

A factual situation similar to that involved herein was subjected to scrutiny by this Court in Walt Disney Inc. v. Commissioner, 97 T.C. 221 (1991), revd. 4 F.3d 735 (9th Cir. 1993). In holding that there was no ITC recapture upon the

transfer of the shares of a subsidiary out of the consolidated group, we rejected respondent's argument that Example (5) was premised on the section 38 assets' remaining in the consolidated group and that there was no intention to observe this condition at the time the plans resulting in the transfer of the section 38 assets outside the consolidated group in Walt Disney Inc. were formulated.  In so doing, we stated:

> Although the example (5) stock sale occurs in the year following the sale of the property within the affiliated group, there is nothing in section 1.1502-3(f)(2)(i) and (3), Income Tax Regs., requiring a minimum waiting period.  Indeed, as little as a 1-day wait would be literally consistent with the examples in the regulation:  the sale from S to T in example (1) could occur on December 31, 1968, and the sale of the S[T] stock out of the affiliated group in example (5) could occur on January 1, 1969.  Nor is there any express requirement that the idea for the stock transfer arise after the sale of the property within the affiliated group.  Thus, respondent's contention that the regulation is premised on the property remaining in the affiliated group is not apparent from the regulation itself.  [Walt Disney Inc. v. Commissioner, 97 T.C. at 228.]

Based upon this analysis, we held that the regulation controlled, stating "When the authority to prescribe legislative regulations exists, this Court is not inclined to interfere if the regulations as written support the taxpayer's position."  Id. We adopted this view even though an "unwarranted benefit to the taxpayer" might exist (id. at 229) and restated the position we had taken in Woods Investment Co. v. Commissioner, 85 T.C. 274, 281-282 (1985), that if respondent were dissatisfied with the import of a regulation, she should use her broad powers to amend

the regulation and not look to the courts to do it for her. Although we made no specific reference to Rev. Rul. 82-20, supra, it is clear that we rejected its reasoning by adhering to Example (5). Indeed, we reinforced such rejection by a lengthy discussion and rejection of the role of the so-called step transaction doctrine upon which Rev. Rul. 82-20 rested. See Walt Disney Inc. v. Commissioner, 97 T.C. at 231-236; see also Tandy Corp. v. Commissioner, supra, wherein we rejected the application of the step transaction doctrine to the issue of an ITC recapture in a nonconsolidated return situation.

The next development in the scenario involved herein is the decision of the Court of Appeals for the Second Circuit in Salomon, Inc. v. United States, 976 F.2d 837 (2d Cir. 1992). A factual situation substantially similar to that involved herein and in Walt Disney Inc. v. Commissioner, supra, confronted the Court of Appeals in Salomon. In deciding the case in favor of the Government, the Court of Appeals for the Second Circuit declared that the fact that, in Example (5), "the asset transfer occurs in one year (1968) and the spinoff in the next year (1969)", Salomon, Inc. v. United States, supra at 842, constituted a significant difference from the situation dealt with in Rev. Rul. 82-20, supra, and the Court of Appeals concluded:

> The Revenue Ruling thus complements CRR Example 5 by dealing with transactions that occur rapidly and are intended at their onset to transfer section 38 property

outside the consolidated group. The consolidated return regulations state that "[t]he Internal Revenue Code, <u>or other law</u>, shall be applicable to the group to the extent the regulations do not exclude its application." Treas. Reg. § 1.1502-80 (emphasis added). Revenue Ruling 82-20 is within the ambit of such "other law." We accordingly believe that the two rulings are not in conflict, and may consistently be read together. Judge Freeh did not err when he viewed the two rulings as alternatives and then chose Revenue Ruling 82-20 based on EMC's intention "immediately" to spin-off EC following the asset transfer. [<u>Salomon, Inc. v. United States</u>, 976 F.2d at 842-843.]

Having thus adopted the Government's position based upon its conclusion that Rev. Rul. 82-20, <u>supra</u>, was reasonable and consistent with prevailing law, the Court of Appeals for the Second Circuit declined to discuss whether the step transaction doctrine as such would, in any event, apply. <u>Salomon, Inc. v. United States</u>, <u>supra</u> at 843-844.

The final development in the scenario is the reversal of our decision in <u>Walt Disney Inc. v. Commissioner</u>, <u>supra</u>, by the Court of Appeals for the Ninth Circuit. Relying heavily upon <u>Salomon, Inc. v. United States</u>, <u>supra</u>, the Court of Appeals for the Ninth Circuit also concluded that Rev. Rul. 82-20, <u>supra</u>, and <u>Example (5)</u> were consistent and agreed with the Court of Appeals for the Second Circuit, with the further comment that Rev. Rul. 82-20 qualified as "other law" under section 1.1502-80, Income Tax Regs. <u>Walt Disney Inc. v. Commissioner</u>, 4 F.3d at 741 n.10. The Court of Appeals for the Ninth Circuit made no reference to the step transaction doctrine.

Against the foregoing background, we proceed to consider the positions of the parties.  Relying on the position we took in Walt Disney Inc. v. Commissioner, supra, petitioner contends that the regulations, section 1.1502-3(f)(2) and (3), and Example (5) in particular, Income Tax Regs., are dispositive and that the step transaction doctrine has no application herein.  Respondent, relying on Rev. Rul. 82-20, supra, and the status accorded it by the Courts of Appeals for the Second and Ninth Circuits in Salomon, Inc. v. United States, supra, and Walt Disney Inc. v. Commissioner, supra, argues in effect that Rev. Rul. 82-20, supra, operates independently of Example (5) and should control and that, in any event, the application of the step transaction doctrine should result in the recapture by petitioner of the investment tax credit.  We agree with petitioner.

With all due respect, we disagree with both the result and the reasoning of the Courts of Appeals and adhere to the position we took in Walt Disney Inc. v. Commissioner, 97 T.C. 221 (1991). We think that the fact that the transfer of the assets and the transfer of the stock occurred in the same, rather than different, taxable years does not provide a meaningful basis for distinguishing Rev. Rul. 82-20, supra, from Example (5) of the regulations.  Indeed, as we have already pointed out, see supra pp. 9-10, we specifically refused to give weight to this element in Walt Disney Inc. v. Commissioner, supra.  Our continued adherence to this point of view is reinforced by the fact that

the time span element is also present in Example (3) where the
section 38 assets are transferred in a different taxable year and
the recapture of the investment tax credit is mandated.  The
contrast between these two examples highlights the fact that it
is what is transferred and not when the transfer occurs that is
significant.  Indeed, if timing was a significant element in
Example (5), one would think that respondent would have referred
to Example (5) and this element in Rev. Rul. 82-20, supra, and
thus provided the tax-paying public with notice of respondent's
restrictive interpretation of Example (5) rather than leaving
such interpretation to unarticulated alleged inference.  We do
not think the "assumption" referred to in the ruling, see supra
p. 9, constitutes a meaningful signal to this effect.

In the foregoing context, the conflict between Rev. Rul. 82-
20, supra, and Example (5) becomes apparent.  The question then
becomes what, if any, weight we should give to Rev. Rul. 82-20,
supra.  We think the Courts of Appeals for the Second and Ninth
Circuits accorded the ruling undue weight and that revenue
rulings play a lesser role than the language of the opinions of
those Courts of Appeals seems to indicate.  We see no purpose to
be served in engaging in a detailed discussion of the differences
in judicial articulation which can be found in this arena.  We
note, however, that the Court of Appeals for the Sixth Circuit,
to which an appeal herein will lie, has stated:

A Revenue Ruling, however, is not entitled to the deference accorded a statute or a Treasury Regulation. * * * [Threlkeld v. Commissioner, 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294 (1987).]

As we see it, Example (5) and not Rev. Rul. 82-20, supra, provides the key to decision herein. It may well be that Example (5) provides an unwarranted benefit to the taxpayer, but such a consideration was not sufficient to tip the scales in Woods Investment Co. v. Commissioner, 55 T.C. 274 (1985). See supra p. 10. We think as we did in Walt Disney Inc. v. Commissioner, supra, that the same approach applies herein. Respondent's remedy is not to seek to modify the regulation by judicial action or administrative ruling, but to change the regulation itself. See Walt Disney Inc. v. Commissioner, 97 T.C. at 229 (quoting at length from Woods Investment Co. v. Commissioner, 85 T.C. at 281-282)); see also Honeywell Inc. v. Commissioner, 87 T.C. 624, 635 (1986) (respondent had the right to amend the regulations but could not do so "by a revenue ruling or by judicial intervention"); Peninsula Steel Products & Equip. Co. v. Commissioner, 78 T.C. 1029, 1052 (1982) (ruling disapproved in light of regulation); Sims v. Commissioner, 72 T.C. 996, 1006 (1979) (rulings do not have the force of regulations).

Our approach herein obviously also reflects our disagreement with that of the Courts of Appeals for the Second and Ninth Circuits in according Rev. Rul. 82-20, supra, the status of "other law" in order to apply section 1.1502-80, Income Tax Regs.

See supra p. 11.  See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 45-46 (1995) (revenue rulings "do not have the force of law"), supplemented by 104 T.C. 417 (1995).

Finally, we turn to respondent's attempt to salvage her position by arguing that the step transaction doctrine constitutes "other law" within the meaning of section 1.1502-80(a), Income Tax Regs., which provides:

> The Internal Revenue Code, or other law, shall be applicable to the group to the extent the regulations do not exclude its application.  * * *

We rejected respondent's attempt to invoke this provision in Walt Disney Inc. v. Commissioner, 97 T.C. at 231-236.  In our opinion in that case, we set forth a detailed analysis of a factual situation substantially similar to that involved herein and concluded that there were no "meaningless or unnecessary steps" that should be ignored as required by the step transaction doctrine.  We emphasized that respondent had blessed a reorganization plan.  See id. at 225.  We see no need to repeat that analysis herein where the facts are at least as strong as those which were involved in Walt Disney.  In this connection, it is significant that in this case respondent has stipulated that the requirements of section 355 were met.  By so doing, respondent has stipulated that there was a business purpose, i.e., substance, to the transfer by petitioner to LOF Glass, Inc., a position which is inconsistent with her position herein that petitioner disposed of the assets by in effect transferring

them to Pilkington Holdings.  Under these circumstances, we think that the analysis of the Courts of Appeals for the Second Circuit in <u>Salomon, Inc. v. United States</u>, 976 F.2d 837 (1992), and the Ninth Circuit in <u>Walt Disney Inc. v. Commissioner</u>, <u>supra</u>, based on "economic reality" and "substance", which are key elements of the step transaction doctrine, misses the mark in terms of the proper disposition of this case.  See Ginsburg & Levin, Mergers, Acquisitions and Buyouts, sec. 1002.1.1.4 (July 1996).

In sum, we hold for petitioner on the issue of the recapture of the investment tax credit.  Such being the case, there is no addition to tax under section 6661.  We again point out that this opinion resolves only the investment tax credit recapture issue and that an additional issue relating to the allocation of deductions is still before the Court.  See <u>supra</u> note 2.

Reviewed by the Court.


COHEN, CHABOT, GERBER, PARR, WHALEN, COLVIN, CHIECHI, LARO, FOLEY, and GALE, <u>JJ</u>., agree with this majority opinion.

HALPERN, <u>J</u>., did not participate in the consideration of this opinion.

SWIFT, J., respectfully dissenting:  With the benefit of the analyses provided in the opinions of the Second and Ninth Circuit Courts of Appeals in Salomon, Inc. v. United States, 976 F.2d 837 (2d Cir. 1992), and Walt Disney, Inc. v. Commissioner, 4 F.3d 735 (9th Cir. 1993), we should recognize the error made in our opinion in Walt Disney, Inc. v. Commissioner, 97 T.C. 221 (1991), and sustain respondent's position in this case.

The majority suggests that the issue herein turns primarily on whether a particular provision of the consolidated return regulations (namely, sec. 1.1502-3(f)(3), Example (5), Income Tax Regs.) controls over a revenue ruling (namely, Rev. Rul. 82-20, 1982-1 C.B. 6).  The majority argues that the above Courts of Appeals, in the cited opinions, give undue weight to the revenue ruling and ignore what the majority regards as the clear mandate of the regulation under section 1502.

The majority is correct in stating that revenue rulings do not generally constitute legal precedent or "other law".  As the language quoted below, however, from each of the cited opinions indicates, neither the U.S. Courts of Appeals for the Second nor the Ninth Circuit rely exclusively on the conclusive effect of the revenue ruling.  Rather, both rely heavily on "economic reality" and the "substance-over-form" doctrines, which are simply broader labels for, and which encompass, the step transaction doctrine.

The Court of Appeals for the Second Circuit in <u>Salomon, Inc.</u> <u>v. United States</u>, <u>supra</u> at 842-843, explained as follows:

> In substance, if not in form, the direct and the circuitous transaction are the same.  See <u>Commissioner v. Court Holding Co.</u>, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945).  Each achieves a rapid transfer of section 38 property outside the group.  To distinguish between them would deny economic reality.  See <u>Gregory v. Helvering</u>, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935) (refusing to "exalt artifice above reality" in determining tax liability).  Moreover, such a holding would allow the common parent of a consolidated group, such as * * * [the parent], to move section 38 property outside the group without paying recapture taxes simply by first transferring the property to a member subsidiary and then distributing the subsidiary's stock to the third-party.  * * *

> * * * * * * *

> The rapidity with which these components follow one another suggest that they are, in substance, parts of one overall transaction intended to dispose of the section 38 assets outside of the consolidated group. * * * These factual circumstances, timing and intent * * *.  * * * lead to the conclusion that the two components are steps in a larger transaction which, when viewed as a whole, constitutes a section 47(a)(1) "disposition."  * * *

> * * * * * * *

> Under these circumstances, the transaction is, in substance, a means of moving the assets outside the group.  * * *

The Court of Appeals for the Ninth Circuit in <u>Walt Disney, Inc. v. Commissioner</u>, <u>supra</u> at 741, relied heavily upon the analysis of the Court of Appeals for the Second Circuit, quoted from the above language, and stated the following --

> "in substance, if not in form, the direct and the circuitous transaction are the same" and "to

distinguish between them would deny economic reality"
and would allow the common parent of a consolidated
group to circumvent easily the recapture requirement.
* * *

The position we adopted in our opinion in Walt Disney, Inc. v. Commissioner, 97 T.C. at 221, failed to apply properly the substance-over-form doctrine and failed to give proper weight to section 1.47-3(f)(1), Income Tax Regs., which provides clearly that to the extent ownership of an affiliated transferee corporation changes hands as part of the transfer of property to the transferee corporation, a taxable disposition has occurred under section 47.  See sec. 1.47-3(f)(1), (2), (6) Examples (2), (3), and (4), Income Tax Regs.

The above regulations under section 1.47-3(f)(1), (2) (6), should be read together with section 1.1502-3(f)(3), Income Tax Regs.  Where a change in ownership of an affiliated transferee company is contemplated at the time of a transfer of section 38 property and where the change in ownership that occurs is, in substance, in economic reality, and/or under the step transaction doctrine, integral to the transfer of the property outside the affiliated group, the transfer should be treated, to the extent of the change in ownership of the transferee corporation, as a taxable disposition under section 47.

The weight to be given a revenue ruling is not the issue in this case.  Rather, the issue is the validity of the underlying rationale of Rev. Rul. 82-20, 1982-1 C.B. 6, -- namely, whether

the transaction before us and its taxability under section 47 is controlled by the substance thereof. As is explained in the cited ruling:

> When there is no intention at the time of transfer to keep the property within the consolidated group, the transaction should be viewed as a whole and not as separate individual transactions. * * *

> Because the transfer * * * is a step in the planned transfer of the property outside the group, section 1.1502-3(f)(2)(i) of the regulations does not apply. [Rev. Rul. 82-20, 1982-1 C.B. 6; citations omitted.]

In Tandy Corp. v. Commissioner, 92 T.C. 1165 (1989), we held that, on the particular facts of that case, recapture under section 47 was not appropriate where a change in ownership of a transferee corporation occurred in a year after a transfer of property to the transferee corporation. With respect, however, to a fact situation similar to the instant case (where a transfer of property and an ownership change in the transferee corporation effectively occur during the same taxable year and as part of the same integral transaction), we explained in Tandy Corp. v. Commissioner, supra, that section 47 recapture would be triggered, as follows:

> To treat * * * [the taxpayer] as having relinquished during the year before the Court a "substantial interest" as contemplated by section 1.47-3(f)(1)(ii)(b), Income Tax Regs., would require a concomitant finding that such an interest passed to * * * [the taxpayer's] shareholders at the same time. * * * [Id. at 1171.]

The majority op. pp. 16-17 implicitly acknowledges that the substance-over-form and step transaction doctrines have application as "other law" in the consolidated return context under section 1.1502-80, Income Tax Regs. The majority, however, summarily dismisses the application of such doctrines to the specific facts of this case because each step of the reorganization plan adopted by petitioner had a business purpose.

Both the Second and the Ninth Circuit Courts of Appeals in the above-cited opinions applied the substance-over-form doctrine in spite of the presence of a business purpose for each step of the reorganizations involved in those cases and, as stated above, concluded that the substance thereof, for purposes of section 47, constituted dispositions of property outside the consolidated group, thus triggering recapture under section 47. See also the District Court's opinion in Salomon v. United States, 92-1 USTC par. 50,155, 70 AFTR 2d par. 92-5872 (S.D.N.Y. 1992).

In King Enters., Inc. v. United States, 189 Ct. Cl. 466, 418 F.2d 511, 516 n.6 (1969), the Court of Claims explained that various courts have --

> enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences.

With regard more specifically to the question of the relationship between the step transaction doctrine and the business purpose aspect of a transaction and in the context of analyzing a section 332 liquidation, the Court of Appeals for the Tenth Circuit in Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517 (10th Cir. 1991), rejected the contention that a valid business purpose precludes application of the step transaction doctrine. The Court of Appeals explained as follows:

> Most cases applying the step transaction doctrine, far from identifying business purpose as an element whose absence is prerequisite to that application, do not even include discussion of business purpose as a related issue. In some cases, the existence of a business purpose is considered one factor in determining whether form and substance coincide. In others, the lack of business purpose is accepted as reason to apply the step transaction doctrine. We have found no case holding that the existence of a business purpose precludes the application of the step transaction doctrine. [Associated Wholesale Grocers, Inc. v. United States, 927 F.2d at 1526-1527; fn. refs. omitted.]

The Court of Appeals for the Tenth Circuit in Associated Wholesale Grocers., Inc. v. United States, supra at 1527 n.15, also cited our opinion in Vest v. Commissioner, 57 T.C. 128 (1971), revd. in part and affd. in part on other grounds 481 F.2d 238 (5th Cir. 1973), and commented thereon as follows:

> After identifying a business purpose, the * * * [Tax Court in Vest v. Commissioner] undertakes a thorough discussion of whether to treat a stock exchange as a step transaction. 57 T.C. at 145. The * * * [Tax Court] remarked "[t]he fact that there were business

purposes for the incorporation of V Bar is <u>an indication</u> that its formation was not a step mutually interdependent with the subsequent stock exchange" and continued to consider other factors, including the existence of a binding commitment, the timing of the steps, and the actual intent of parties.  <u>Id.</u> at 145-46. (Emphasis added [by Tenth Circuit]).  Far from precluding step transaction analysis, the business purpose was not even considered the most significant factor in <u>Vest</u>. * * *

In <u>Yoc Heating Corp. v. Commissioner</u>, 61 T.C. 168, 177 (1973) (Court reviewed), we expressly commented on the relationship between the step transaction doctrine and the business purpose aspect of a transaction, and we did so in the particular context of the reorganization provisions of the Code, which were also involved in that case, as follows:

> Our path to decision is framed within two cardinal principles, which apply in the reorganization area and which are so well established as not to require supporting citations.  First, the fact that the form of the transaction conforms to the literal wording of the definition of a reorganization is not controlling. Second, when a transaction is composed of a series of interdependent steps, each undertaken to achieve an overall objective, the various steps should be viewed in their entirety for the purpose of determining its tax consequences--the so-called "integrated transaction" doctrine. * * *  The fact that for valid business reasons there was a delay of several months before * * * [the new entity] came into existence and completed the acquisition does not militate against * * * [application of the step transaction doctrine]. [Citations omitted.]

It is acknowledged that the Commissioner in Rev. Rul. 79-250, 1979-C.B. 156, suggested that, in the context of certain reorganization transactions, preliminary and related transactions

or steps will not necessarily be stepped together and ignored where each such preliminary step constitutes a permanent alteration of a previous bona fide business relationship.  That general statement in Rev. Rul. 79-250, however, does not preclude application of the step transaction doctrine, the substance over form doctrine, or the integrated transaction doctrine to the facts of this case involving recapture of investment tax credit under section 47.  See also Associated Wholesale Grocers., Inc. v. United States, supra at 1526-1527; Rev. Rul. 96-29, 1996-24 I.R.B. 5.

Based on the above authority, I believe that the majority herein errs in suggesting, majority op. pp. 16-17, that the business purpose associated with the transfer of petitioner's glass division to a subsidiary and with the change in ownership of the subsidiary provides, for purposes of section 47 recapture, the sum and substance of the transaction before us and effectively precludes any meaningful analysis under the substance-over-form, the step transaction, or the integrated transaction doctrines.

A brief analysis of the substance and steps of the transactions before us is appropriate.

The Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie, has adopted the end result approach of the step transaction doctrine.  In Brown v. United

States, 868 F.2d 859, 862-863 (6th Cir. 1989), the Court of Appeals for the Sixth Circuit stated as follows --

> the essence of the step transaction doctrine is that an "integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences". * * *
>
> * * * * * * *
>
> Under the end result test of the step transaction doctrine, "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." King Enters., Inc. v. United States, 418 F.2d at 516. * * *

Here the parties have stipulated the following facts with regard to the transfer of LOF's glass division and the change in ownership of LOF Glass.

Late in 1985, representatives of Pilkington approached LOF concerning acquisition of LOF's glass division. During November of 1985 through early March of 1986, negotiations regarding the possible acquisition took place.

On March 6, 1986, LOF transferred the glass division to LOF Glass, the new subsidiary that had been formed for that purpose. One day later, on March 7, 1986, LOF entered into a 45-page agreement to transfer to Pilkington Holdings all of its stock interest in LOF Glass in exchange for Pilkington Holdings' stock interest in LOF.

The March 7, 1986, agreement to exchange stock expressly refers to the March 6, 1986, transfer of the glass division to LOF Glass and establishes the integrated nature of these transactions.

Seven weeks later, on April 28, 1986, the exchange of stock that had been agreed to on March 7, 1986, was consummated.

After April 28, 1986, LOF Glass was no longer part of LOF's affiliated group and no longer was included in LOF's consolidated Federal income tax return.

It is apparent that the transfer of the glass division to LOF Glass and the agreement one day later to transfer the stock of LOF Glass outside the LOF affiliated group constituted an integrated transaction intended to move the glass division (and the related section 38 property) outside of LOF's affiliated group.

Based on this stipulated factual record and on this issue on which petitioner has the burden of proof (see Rule 142(a)), only one conclusion can be reasonably reached -- namely, that in spite of the qualification of the transaction as a reorganization under section 368(a)(1)(D)(allowing LOF to avoid recognizing taxable gain or loss on the transfer of the glass business and allowing LOF and Pilkington Holdings to avoid recognizing taxable gain or loss on their exchange of stock), the substance of the integrated transaction by which LOF's glass division in 1986 was transferred outside the LOF affiliated group constituted a disposition of

property under section 47 and triggered recapture of investment tax credit on any section 38 property that was included with the property transferred.

Section 1.1502-3(f)(3), Example (5), Income Tax Regs., simply is not applicable. That example involved, in year 1, only a transfer of property within the affiliated group. After the transfer, the property stayed within the affiliated group and was included in the consolidated return for the remainder of year 1. In year 2, no further transfer of property occurred. Rather, in an apparently unrelated transaction, a third party purchased the stock of the transferee, and the transferee, which had received the property in year 1, left the affiliated group. For the first time in year 2, the property will not be included in the consolidated return of the affiliated group.

The transaction described in Example (5) of the above regulation bears little resemblance to that involved in this case (where a transfer of property and a change in ownership of the transferee corporation occur effectively within the same taxable year as part and parcel of a single plan and transaction under which the transferee corporation promptly leaves the affiliated group and is no longer part of the affiliated group for purposes of inclusion in the transferor corporation's consolidated tax return). Example (5) of the above regulation under the consolidated return regulations should not be read to immunize

the integrated transaction before us from recapture under section 47.

It bears noting that the facts of the instant transaction are distinguishable from the facts of <u>Salomon v. Commissioner</u>, 976 F.2d 837 (2d Cir. 1992), and <u>Walt Disney, Inc. v. Commissioner</u>, 4 F.3d 735 (9th Cir. 1993).  Although the spin-offs in those cases resulted in a change in the identity of the corporate holder of the section 38 property, that property remained in the same economic family, with the same shareholders holding the stock of the new corporate owner of the section 38 property.  In the instant case, at the inception of the transactions, Pilkington held only a 29-percent interest in the stock of LOF.  As a result of the completion of the split off, Pilkington acquired a 100-percent interest in the stock of LOF Glass, reflecting a 71-percent shift in the ownership of the corporation owning the section 38 property after the split off.

For the reasons stated herein and in the above opinions of the courts of appeals, I dissent.

JACOBS, WELLS, RUWE, BEGHE, and VASQUEZ, <u>JJ</u>., agree with this dissent.

BEGHE, J., dissenting:  Having joined Judge Swift's dissent, I add a few words in an effort to provide some further support and explanation.  The case at hand is an appropriate occasion to apply the intent, end result, integrated transaction version of the step-transaction doctrine to support a finding of early disposition that results in ITC recapture.

Petitioner's initial drop-down to LOF Glass of the glass business and its section 38 assets, which occurred on March 6, 1986, was followed 1 day later by the single-spaced, 45-page, March 7, 1986, agreement for the split-off exchange of shares of petitioner for shares of LOF Glass by Pilkington Holdings.  The split-off occurred on April 28, 1986, pursuant to that agreement, as amended in immaterial respects.  Although the parties stipulated that the drop-down occurred for valid business reasons, reasons that were presumably independent of the impending divestiture, there were no substantial conditions in the March 7, 1986, agreement to consummation of the split-off.[4]

The majority, uncritically following our opinion in Walt Disney, Inc. v. Commissioner, 97 T.C. 221 (1991), revd. 4 F.3d 735 (9th Cir. 1993), assumes an unwarranted equivalence between the two events described in the section 1502 regulation examples

---

[4]    Expiration of all Hart-Scott-Rodino waiting periods, receipt of tax opinions that the split-off would be a tax-free exchange under section 355, and satisfaction of all other stated conditions, must have occurred or have been waived between March 6 and April 28, 1986.

and the LOF Glass divestiture transaction.[5]  Contrary to the majority's assumption, the unadorned descriptions of the events in the regulation's two examples indicate the lack of connection between the intragroup sale of section 38 assets in year 1 and the sale of the stock of the purchaser to a third party outside the group in year 2.  The majority goes on to disregard the obvious connection--supplied by the intent, manifested contemporaneously with the drop-down to LOF Glass, to accomplish the end result of the split-off--that binds the steps in the case at hand in an integrated transaction.[6]

The transactions in the case at hand are not just two unconnected sales.  They evidence a flow of events that comprise a two-step divestiture, the second step of which is an exchange

---

[5]     There are at least three significant differences between the facts of the examples in the section 1502 regulation and the facts of our case.  In the examples, the sale of the section 38 assets and the sale of the purchaser's stock occur in different tax years, whereas in our case they occur in the same year; the first sale in the examples appears to be made to a preexisting member of the group, whereas in our case the transfer is made to a newly created subsidiary organized to do the deal, including the second step; and the examples concern two unrelated sales, whereas the first transaction in our case is a drop-down of assets that is an integral and necessary step of the plan to accomplish the agreed upon tax-free split-off exchange of shares that is intended to follow.

[6]     Events should be deemed to have a connection for tax purposes when dictated by the logic of events that has to do with cause and effect relationships and necessary connections or outcomes.  Under that formulation, there is no connection between the sales in the examples in the sec. 1502 regulation and there is a connection between the drop-down and the split-off in the case at hand.

of shares under section 368(a)(1)(D) that qualifies for nonrecognition under section 355.  The initial drop-down of assets into a subsidiary in exchange for its shares is essential to enable the intended divestiture to be accomplished by a share for share exchange that entitles the second step to nonrecognition of gain to both parties.  The connection that binds the two steps, as in J.E. Seagram Corp. v. Commissioner, 104 T.C. 75, 91-99 (1995), is manifested in the plan of reorganization, which embodies the intent to achieve the end result.[7]  Although the first step in the case at hand has an independent business purpose in the sense that it would not have been fruitless in all events to take that step--after all, a corporation engaged in more than one business almost invariably has a business purpose for dropping a business into a subsidiary, if only to protect the assets of its other businesses from the liabilities and risks that are encapsulated by the drop-down--the independent business purpose of the first step in the case at hand is trumped by the more important business purpose of completing the divestiture by means of a tax-free exchange, which relegates the first step to a subordinate implementing role.

---

[7]     Contrary to the views of those who would read the intent, end result, integrated transaction version of the step-transaction doctrine out of the judicial arsenal, see, e.g., Ginsburg & Levin, Mergers, Acquisitions and Buyouts, secs. 208.4.5, 608.1, 608.3.1, 610.9, 1002.1.4 (July 1996); Bowen, The End Result Test, 49 Taxes 722 (1994), there is an appropriate role for this "weak" version of the step-transaction doctrine in situations such as the case at hand.

The integrated transaction approach is a legitimate "weak" version of the step-transaction doctrine, as contrasted with the "strong" requirements[8] that must be satisfied, under its binding commitment and interdependence versions, in order to disregard unnecessary intermediate steps.[9]  The creation of and drop-down to LOF Glass were necessary to accomplish the divestiture (separating LOF Glass, the new holder of the glass business and its section 38 assets, from the affiliated group), which was the intended end result that followed the initial step.  The intention to effect that end result suffices to justify application of the integrated transaction approach to conclude that the section 38 assets left the economic family of petitioner's affiliated group in a way that requires ITC recapture.

JACOBS, J., agrees with this dissent.

---

[8]    The terms "weak" and "strong" are used here in the mathematical sense of "subject to less/more exacting or numerous conditions".  See Oxford English Dictionary, Entries under "weak", 19.f(b) and "strong", 19.c (2d ed. 1995).  Analogous usages occur in logic, physics, and cosmology.  On "weakened" and "strengthened" moods of the syllogism, see Cohen & Nagel, An Introduction to Logic and Scientific Method 84, 86 (1934).  On the "strong" force in elementary particle physics, which holds the nucleus together, and the "weak" force, which causes the decay of many of the elementary particles, see, e.g., 28 Encyclopedia Britannica, Subatomic Particles 239-240 (15th ed. 1993).  On the "weak" and "strong" anthropic principles regarding the state of the universe, see Hawking, A Brief History of Time 124-126 (1988).  See also Penrose, The Emperor's New Mind 17-23 (1989), on "strong" artificial intelligence.

[9]    As in West Coast Mktg. Corp. v. Commissioner, 46 T.C. 32 (1966).